

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 3, 2024

**By ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

    **Re:**    *United States v. Adama Sow*, **23 Cr. 593 (VEC)**

Dear Judge Caproni:

    The Government respectfully submits this letter in advance of the July 16, 2024 sentencing of the defendant, Adama Sow. On March 21, 2024, the defendant pled guilty to a one-count indictment charging her with trafficking in counterfeit goods, in violation of 18 U.S.C. §§ 2320(a)(1) and 2. For the reasons set forth below, the Government submits that a sentence at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 46 to 57 months' imprisonment would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

**I.    Offense Conduct**

    The defendant is among the most prolific traffickers of counterfeit goods ever charged in United States federal court.

    From at least January 2023 to October 2023, the defendant trafficked massive quantities of fake luxury goods—handbags, belts, backpacks, wallets, shoes, clothing, scarves, and other accessories—from a storage facility in Midtown Manhattan (the "Storage Facility"). (*See* PSR ¶ 7). To mask her identity, she frequently operated using an alias. (*Id.* ¶ 8). On October 10, 2023, and again on October 16, 2023, the defendant met with a confidential source ("CS-1") at the defendant's storage units inside the Storage Facility, and gave CS-1 counterfeit goods. (*Id.* ¶¶ 9-10). Both controlled buys were audio- and video-recorded. (*Id.*).

    By October 20, 2023, when law enforcement officers began executing the first search warrant at the Storage Facility, Sow controlled approximately 21 storage units. (*Id.* ¶ 8). Some

of those units were 10 feet wide, with a depth of as much as 20 feet. In some cases, interior walls separating adjacent units had been removed, making the storage spaces even larger.

The defendant's operation was so extensive that she maintained one of her units as a showroom for prospective buyers (typically, downstream counterfeit goods sellers), depicted below:



Dozens of law enforcement officers worked full-time for almost a week to remove the goods seized from the Storage Facility—roughly half of which came from units controlled by the defendant. In total, approximately 83,806 counterfeit items, bearing the false trademarks of at least 15 luxury brands (the "Victim Brands"), were recovered from the defendant's units. (PSR ¶¶ 11-13).

Unlike many counterfeit goods sold on the streets, the defendant's goods were generally in new or excellent condition, in packaging that also bore the false trademarks of the Victim Brands, and bulk-stored inside unmarked cardboard boxes. A photograph of a set of boxes, including

certain of the defendant's boxes, seized and aggregated by law enforcement in a common area of the Storage Facility, is below:



Following the seizures, brand experts evaluated the items seized from the defendant's units, categorizing the items into "brand-product" categories based on (i) brand and (ii) product type within each brand (backpack, handbag, wallet, etc.). (PSR ¶ 12). The brand experts determined that the total estimated authentic value of the defendant's items—that is, what the items would cost if they were real—was $502.8 million. (*Id.* ¶ 13). The brand experts further determined, based on training and experience making undercover purchases of counterfeit goods, high and low street values of each brand-product category—*i.e.*, the highest price for which such a counterfeit item would sell, and the lowest price for which such a counterfeit item would sell. (*Id.*). Multiplying each of the high-end street prices by the number of items in each brand-product category, the experts calculated the total estimated high-end "street" value of the goods to be $10,952,975. (PSR ¶¶ 11-13).

Although the Government is still working to ascertain the full amount of actual losses suffered by the Victim Brands,[1] it is clear that their losses were significant and went far beyond lost sales revenue. As one victim ("Victim Brand-1") writes: "Far greater economic harm comes from the negative impact that these counterfeits have on [Victim Brand-1's] reputation when consumers looking to buy high quality, genuine [Victim Brand-1] merchandise decide not to do so because they see Defendant's lower-quality counterfeit goods in the marketplace and

---

[1] The Government will provide such information to the Court in advance of any deadline set by the Court, within 90 days of sentencing, for the final determination of the victims' losses. *See* 18 U.S.C. § 3664(d)(5).

mistakenly believe they are genuine." (Ex. A).[2]  Another victim ("Victim Brand-2") similarly observes that [Victim Brand-2's] customers are less likely to purchase genuine products if the marketplace is flooded with poorly constructed knockoffs and associate [Victim Brand-2's] brand with poor craftsmanship." (Ex. B).

## II.    Guidelines Calculation[3]

Under the Guidelines, the defendant's base offense level is eight, pursuant to U.S.S.G. § 2B5.3(a).

Pursuant to U.S.S.G. §§ 2B5.3(b)(1)(B) and 2B1.1(b)(1)(K), a 20-level increase applies because the infringement amount—*i.e.*, the estimated retail value of the infringing items in the market in which they are sold[4]—was more than $9.5 million and less than $25 million (specifically, $10.9 million). Contrary to the defendant's claim that a 16-level increase should apply based on the low-end range of estimated street values (*see* Addendum to the Presentence Report at 20), the high-end range most accurately represents both the true retail value of the goods and the extent of the Victim Brands' losses. The high-end number, which still represents a 97.8% reduction of the $502.8 million authentic value of the goods, reflects the fact that the defendant's goods were generally wrapped, packaged, and in mint condition, unlike many counterfeit goods sold on the street.

After a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), and an additional two-level reduction for being a qualifying zero-point offender under U.S.S.G. § 4C1.1, the defendant's total offense level is 23. The defendant has zero criminal history points, which places her in Criminal History Category I and results in a Guidelines range of 46 to 57 months' imprisonment.

## III.    Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[2] The Government respectfully requests that the enclosed letters from the Victim Brands be filed under seal.

[3] There is no plea agreement in this case. The Probation Office agrees with the Guidelines calculation set forth in this section. (*See* PSR ¶¶ 20-29).

[4] The Government does not dispute that, pursuant to application notes 2(A)-(C) to U.S.S.G. § 2B5.3, the infringement amount in this case is determined by the retail value of the *infringing* (*i.e.*, counterfeit) items, and not by the value of the *infringed* (*i.e.*, authentic) items.

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## IV.    A Sentence at the Top of the Guidelines Range is Warranted

The Government respectfully submits that a sentence at the high end of the Guidelines range is necessary and appropriate in this case for the reasons set forth below.

The defendant trafficked a historically large quantity of fake goods and inflicted a staggering amount of harm on the Victim Brands that she targeted. Victim Brand-1, for example, which was founded more than a century and a half ago, describes the defendant's crime as "one of the largest ever instances of a defendant trafficking in goods bearing counterfeit [Victim Brand-1] marks in U.S. history." (Ex. A). By flooding the streets with those fake, low-quality goods, the defendant deprived those victim brands of sales and, even worse, helped to undermine the reputation for product quality and integrity that the Victim Brands have invested billions of dollars and decades of effort to protect.

In addition, the impact of the defendant's crime reaches far beyond the Victim Brands. Counterfeit goods sellers take business away from legitimate local retailers. Those sellers deprive the public of tax money that would be paid by the Victim Brands and the legitimate retailers they authorize to sell their merchandise. And those sellers offer no recourse to customers who are disappointed by the lower quality or defective nature of the goods that they have purchased.

Although this conviction is the defendant's first, it does not reflect a temporary lapse in judgment or an aberration from otherwise lawful behavior. Rather, as reflected by the 21 storage units and more than 83,000 counterfeit items under her control during a single week in October 2023 alone, the defendant was engaged in a long-running and highly successful business enterprise. The defendant maintained a network of upstream suppliers large enough to keep

thousands of cubic feet of storage space loaded with goods, and a network of downstream distributors large enough to require the use of one of her storage units as a dedicated showroom. A significant incarceratory sentence is necessary to deter the defendant from returning to those extensive networks and resuming her illegal business after the completion of her sentence.

Finally, a top-of-Guidelines sentence would promote general deterrence. According to the U.S. Patent and Trademark Office, counterfeiting is the "largest criminal enterprise in the world," eclipsing even the illegal drug trade. *See Intellectual Property and Counterfeit Goods—Landscape Review of Existing/Emerging Research*, U.S. Department of Commerce (Feb. 2020), available at: https://www.uspto.gov/sites/default/files/documents/USPTO-Counterfeit.pdf.    In 2018, the market for counterfeit products was estimated to be between \$1.7 and \$4.5 trillion, with 60 to 80% of those products purchased by Americans. *Id.*  Street sellers of such goods are common in New York City, but apprehensions of higher-level suppliers—such as the defendant—are relatively rare. A significant custodial sentence would send a message to similar suppliers and would-be suppliers, including those who operated or operate out of the Storage Facility, that large-scale counterfeit goods trafficking carries severe consequences.

## V.    Conclusion

For the reasons explained above, the Government respectfully requests that the Court impose a sentence at the top of the applicable Guidelines range of 46 to 57 months' imprisonment.[5]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:    _____
Henry L. Ross
Assistant United States Attorney
(212) 637-2442

Cc: Martin Cohen, Esq. (by ECF)

---

[5] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b).  *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).