UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
            - v -                                   :              23 Cr. 593 (VEC)
                                                    :
ADAMA SOW,                                          :
                                                    :
                        Defendant.                  :
--------------------------------------------------- x

## SENTENCING MEMORANDUM ON BEHALF OF
## ADAMA SOW

TAMARA GIWA, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
ADAMA SOW
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8737

MARTIN S. COHEN
*Of Counsel*

TO:   DAMIAN WILLIAMS, Esq.
      United States Attorney
      Southern District of New York
      One. St. Andrew's Plaza
      New York, New York 10007
      Attn:  HENRY ROSS, ESQ.
             Assistant United States Attorney

# Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

_____

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

*To be Filed Under Seal*[1]

July 3, 2024

*By ECF*

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     *United States v. Adama Sow*, 23 Cr. 593  (VEC)

Dear Judge Caproni:

Adama Sow's conduct – selling counterfeit luxury goods to street vendors, who in turn sold them to consumers – was serious. And there is no dispute that the sale of such goods caused harm to the luxury brands, even where, as here, the purchasers of the counterfeit goods would not have otherwise purchased the real luxury items.

It is very difficult, though, to quantify the harm caused by Ms. Sow's conduct. The "infringement amount" under the U.S. Sentencing Guidelines, for example, regardless of how it is calculated, does not provide a reasonable benchmark for fashioning an appropriate sentence. Here, given all of the mitigating factors, including the nature of Ms. Sow's conduct, her background and characteristics, her lack of prior criminal history, her deep acceptance of responsibility, her familial role, and the extraordinarily low risk of recidivism, a non-incarceratory sentence, such as a term of probation, will best satisfy *all* the purposes of sentencing.

## I.     The standard.

The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the individual; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to

_____

[1] I respectfully request that the Court file this submission under seal as it contains sensitive information concerning Ms. Sow's background. I will file a redacted version on ECF.

Honorable Valerie E. Caproni                                                    Page 2
July 3, 2024

Re:    *United States v. Adama Sow*, 23 Cr. 593  (VEC)

provide restitution.  *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an
individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597
(2007).[2]

## II.    The Sentencing Factors.

### A.    The nature of the offense and Ms. Sow's background and characteristics support the requested sentence.

Adama Sow was born in Conakry in 1985. The family was very poor – they lived in a
small home with no running water or electricity, and food was scarce. *See* PSR ¶ 40. Ms. Sow's
father abandoned the family when Ms. Sow was very young, and Ms. Sow worked from a very
young age to help support her mother and four sisters. *See id*. Lansana Conté had taken power in
Guinea shortly before Ms. Sow was born, and she grew up in country plagued by political
violence and oppression. Primarily a Muslim country, girls were considered to be second-class
citizens.[3] As her sisters describe in their letters to the Court, Adama took it upon herself to
provide for her sisters. *See* letters of Kadiatou and Safiatou Sow, attached as Exhibits B and C
respectively. Kadiatou writes, for example, how: "Adama was the one who insisted that I attend
school. In Guinea, especially back then, it was uncommon for girls to pursue an education. . . .
Adama would not allow this to happen, so she enrolled me in school herself."

Sexual violence also plagued Guinea. As a 2016 U.N. Report stated, "Women in Guinea
are subject to various forms of violence, discrimination, and injustice due to persistent socio-
cultural biases. Forced and early marriages, domestic violence, and sexual violence are the most
recurrent forms of violence against girls and women in the country." *See* Amnesty International,
*Shame Must Change Sides: Ensuring Rights and Justice for Victims of Sexual Violence in
Guinea* (2022).[4] ██████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

Ms. Sow immigrated to New York as a teenager. She was homeless for a time, and later
moved in with relatives in Queens. Ms. Sow began braiding hair for a living, and sending money

---

[2] The Probation Office has calculated an offense level of 23 and a criminal history category of I,
resulting in an advisory range of 46 to 57 months' imprisonment. *See* PSR at 22. It has
recommended a sentence of 30 months' imprisonment.

[3] *See*, *e.g.*, World Bank Group, *Priority for Guinea: Improving the status of Women and Girls*
(May 9, 2023) (noting that Guinea ranked 182nd out of 191 countries listed in the U.N.'s Gender
Equality Index. Available at: https://www.worldbank.org/en/news/press-
release/2023/05/09/priority-for-guinea-improving-the-status-of-women-and-girls.

[4] Available at: https://www.amnesty.org/en/documents/afr29/5410/2022/en/

Honorable Valerie E. Caproni                                                          Page 3
July 3, 2024

Re:      *United States v. Adama Sow*, 23 Cr. 593  (VEC)

home.[5] Several of Ms. Sow's sisters followed her to New York, and Ms. Sow continued her role as family caretaker. Kadiatou writes:

> I wouldn't be the person I am today without [Ms. Sow]. I came to the United States at 8 years old. My sister was still only a teenager, but even at such a young age, she took the responsibility of raising me. She has fed me, clothed me, sheltered me, provided me with protection and most importantly nurtured me with the unconditional love that has molded me into the adult I am today.

*See* Exhibit B.

As her sisters went to school and began careers, Ms. Sow provided emotional, financial, and caretaking support. As her nephew explains:

> [M]aunt Adama was the only one that helped my mom take care of us by watching over us and feeding us while my mother worked double shifts at night to provide for us. When we were short on rent, my aunt would chip in money so that we didn't end up on the street. She spent time with us to teach us English and took us to the park to play, over time she became a second mother to us.

*See* Exhibit D.

While Ms. Sow often put others needs over her own, she did find one activity that brought her joy. In around 2015, Ms. Sow began taking acting classes, and found the experience exhilarating. Acting provided Ms. Sow with a sense of freedom that was absent from her day to day existence. *See* PSR ¶ 55. Even now, Ms. Sow's eyes light up when she describes being cast as Tina Turner. While Ms. Sow abandoned acting after her mother disapproved, *see id.*, she is now planning on taking classes again. *See* letter of Ms. Sow, attached as Exhibit A.

Ms. Sow continued to work braiding hair, both at a salon and for private customers. Through one of her customers, Ms. Sow also began selling T-shirts at the salon where she worked. As the pandemic decimated the hair braiding business, Ms. Sow's focus shifted to her T-shirt business. As she tried to increase sales, her T-shirt supplier explained that he also was in the business of selling counterfeit luxury goods, and as he and Ms. Sow worked well together, he enlisted her to help him sell the fake goods.

---

[5] African hair braiding involves adding either synthetic or human hair to a person's natural hair. It generally takes from 4 to 8 hours per client, and a stylist can make a decent wage. *See* Cosmopolitan, *Nine Things You Need to Know Before Getting Braids* (Apr. 10, 2024), available at https://www.cosmopolitan.com/uk/beauty-hair/hair/a11651707/braiding-afro-hair-aftercare/.

Honorable Valerie E. Caproni                                                                                Page 4
July 3, 2024

Re:        *United States v. Adama Sow*, 23 Cr. 593  (VEC)

Ms. Sow thus became an intermediary in the counterfeit luxury goods world. Her supplier provided the goods, which Ms. Sow sold out of the rented storage space in Manhattan.  Ms. Sow's customers were mainly street vendors, who bought from her in bulk; she then paid her supplier, and made a modest profit. In 2023, when the charged conduct occurred, sales were sluggish, while the supplier continued to bring in goods, sizably increasing the inventory on hand.

There is no indication that Ms. Sow or anyone involved in this offense engaged in any deception in connection with the sale of goods. And there is every reason to believe that the consumers well knew that when they were buying a "Louis Vuitton" backpack on Canal Street for $50, where the genuine item would cost over a thousand dollars, what they were purchasing was a cheap knockoff. There is also no indication that the customer who purchased the fake backpack would otherwise have purchased the genuine item if the knockoffs were not available.

Again, to be very clear, the fact that Ms. Sow was not trying to cheat customers into thinking the counterfeit items were real does not excuse the conduct. Ms. Sow knew from the start that her conduct was illegal. As she writes in her letter to the Court, at the time, she "didn't understand the full extent of its severity." *See* Exhibit A. She well understands it now.

Ms. Sow has struggled since her arrest in November 2023. She had long prided herself on being a good person, supportive to those around her. She understands that her conduct was harmful, and is deeply remorseful and ashamed. As the letter writers have noticed, Ms. Sow has shown signs of deep anxiety and depression. Kadiatou writes: "I've always known Adama to have an optimistic perspective on life. However, since this case, she's nothing but a remnant of herself." *See* Exhibit B.

The letter writers also describe Ms. Sow's deep devotion to her family, putting her own interests to the side in order to help those around her:

> ▪ *Djenabou Diallo* (nephew): I have known [Ms. Sow] to be the most caring, loving, and courageous person in our family despite all her struggles growing up. My aunt Adama has selflessly made sacrifices everyday just to make sure we had food on the table and for everyone else's goals and dreams. *See* Exhibit D.

> ▪ *Kadiatou Sow* (younger sister): Adama is a loving selfless woman who has always worked tirelessly to always place the needs of others above her own. For me she sacrificed numerous ambitions, providing me with my basic needs as I pursued a full-time education. . . . She has constantly steered me toward success and encouraged me to strive for the best. *See* Exhibit B.

Honorable Valerie E. Caproni                                                              Page 5
July 3, 2024

Re:      *United States v. Adama Sow*, 23 Cr. 593  (VEC)

> ▪   *Safiatou Sow* (older sister): Unfortunately, my sister
>       Adama didn't have an opportunity to pursue a career
>       as my other sisters and I have been able to do, She
>       devoted herself to helping us instead of pursuing an
>       education herself. I was working, going to school at
>       night, and raising children. Without Adama, I would
>       never have been able to accomplish this. She was
>       there for us when we needed her. *See* Exhibit C.

In sum, the nature of the offense and Ms. Sow's background and characteristics
strongly support the requested sentence.

### III.      Objection to the Presentence Report.

As argued below, the "infringement amount," a term of art under the Guidelines, should
not drive the sentencing determination in this case. Nevertheless, as the Court must calculate the
advisory range whether rational or not, we object to the determination of the "infringement
amount" in this case as exceeding $9,500,000, which results in an increase of 20 offense levels
under the Guidelines. *See* PSR ¶ 21. Instead, for the purposes of the Guidelines, the appropriate
infringement amount is $3,279,340, resulting in a 16-level increase in offense level.

### A.      The Court should use the "low end" retail value of the infringing items to
### determine the "infringement amount" under the Guidelines.

The Guidelines range for selling counterfeit goods is based on the "infringement
amount," which is determined by either the retail value of the infringed item (if the counterfeit
item and the infringed item appear to be identical or substantially equivalent to a reasonably
informed purchaser), or the retail value of the infringing item. *See* U.S.S.G. §2B5.3(b)(1) app. n.
2. Here, because a reasonably informed purchaser would not confuse the counterfeit goods for
the real thing, the infringement amount should be based on the retail value of the infringing
items. *See* PSR §§13, 21.

In October 2023, the Government seized 83,806 counterfeit items from units in a storage
facility which the government believes were rented by Ms. Sow.[6] *See id.* ¶ 11. The
Government's expert calculated what it estimated to be the "low end" and high-end retail value
of the counterfeit items. According to the expert, the low-end value (for example, $45 for a fake

---

[6] We are investigating whether some of the units were improperly ascribed to Ms. Sow, which
may reduce the number of goods properly attributable to her from 83,791 to perhaps 64,311. For
the purposes of sentencing however, we do not believe this possible discrepancy to be material.
Ms. Sow has taken responsibility for renting units in which tens of thousands of counterfeit items
were stored, and even if the total number of goods turned out to be somewhat lower, we do not
believe it should affect the sentencing analysis. Nor should it affect the Guidelines-calculation, as
the estimated infringement amount would remain between $1.5 million and $3.5 million,
resulting in an enhancement of 16 levels under 2B1.1(b)(1)(I).

Honorable Valerie E. Caproni                                                        Page 6
July 3, 2024

Re:      *United States v. Adama Sow*, 23 Cr. 593  (VEC)

Louis Vuitton backpack), totaled $3,279,340; and the high-end value ($220 for the backpack) totaled $10,952,975.

The Government bears the burden of proving disputed sentencing factors by a preponderance of the evidence. *See*, *e.g.*, *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir. 1989). Here, the Government asserts that using the high end value for all 83,791 items is appropriate because the seized goods were "generally still packaged and in mint condition, unlike many counterfeit goods sold on the street." PSR at 20. Whether a counterfeit bag is considered high-end or low-end though, is based more on workmanship and materials used, rather than packaging. *See*, *e.g.*, ABC News, *Superfakes: Copycat Manufactures are Becoming Increasingly Skilled at Producing Knock-Off Designer Handbags* (Apr. 29, 2024).[7] Our review of the evidence does not support a finding that the 83,791 items seized were all of the highest quality (or that they were all in mint condition).

As for the actual street price for the goods sold by Ms. Sow, the only evidence I am aware of suggests that the street prices were much closer to the expert's estimated lower end than to the higher one. As part of the Government's investigation, the informant made two recorded "buys" from Ms. Sow, asking for two counterfeit handbags on one occasion, and two counterfeit backpacks on the other. (On both occasions, Ms. Sow gave the informant the goods without charge.) During one of the "buys," the informant asked Ms. Sow how much he should sell a "Louis Vuitton" backpack for, saying that he would "add 20 on top of what you told me," and from this he arrived at a sale price of $50. This price is much closer to the expert's estimated low-end price ($45), than to the high-end one ($220).

### B.      The "infringement amount" vastly overstates the nature of Ms. Sow's offense.

Once the infringement amount is calculated, the increase in offense level is based on the threshold amounts designed for theft and fraud offenses. *See* U.S.S.G. § 2B5.3(b)(1). The Commission's rationale for equating the sale of counterfeit goods to theft and fraud is that "intellectual property offenses should reflect the nature and magnitude of the pecuniary harm caused by their crimes." *See* § 2B5.3, Background.

There are several reasons though, why using the infringement amount vastly overstates the nature of Ms. Sow's crime. First, there is no evidence that the 83,806 items seized has any relation to the number of items actually sold by Ms. Sow. As indicated above, during the relevant period, the supplier continued to send goods to the storage space, despite the fact that the units were full of other goods that had not been sold. Here, the amount of inventory does not correlate to the number of items sold.

---

[7] Available at https://abcnews.go.com/Business/superfakes-copycat-manufacturers-becoming-increasingly-skilled-producing-knock/story?id=109344382

Honorable Valerie E. Caproni                                                    Page 7
July 3, 2024

Re:       *United States v. Adama Sow*, 23 Cr. 593  (VEC)

Second, there is no indication that a consumer was either deceived into buying a counterfeit good or would otherwise have purchased the genuine item, such that the brands lost revenue. *See generally*, U.S. Gov't Accountability Office, *Intellectual Property: Observations on Efforts to Quantify the Economic Effects of Counterfeit and Pirated Goods*, at 17-18 (Apr. 2010) (describing the difficulty in quantifying loss due to counterfeit goods, noting, among other factors, the substitution rate (that is, the rate at which a consumer is willing to switch from purchasing a fake good to the genuine product), and the level of deception the consumer faced when purchasing the counterfeit good)[8]; *cf.* LVMH Moet Hennessy Louis Vuitton, *2023: New Record Year for LVMH* (reporting revenue of €86.2 billion ($93 billion) in 2023, and noting that brands such as Louis Vuitton and Mark Jacobs achieved record levels  of revenue and profits[9]; U.S.S.G. § 2B1.1 App. n. 3(iii) (defining "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.").

Third, and most fundamentally, the nature and magnitude of the harm caused by many thefts and fraud are categorically different from Ms. Sow's conduct. Ms. Sow did not deceive people into parting with their money; she was not selling fake goods pretending that they were real. She did not set out to hurt other people. For sure, Ms. Sow's conduct contributed to real harms suffered by the luxury brands, and nothing in this submission is meant to say otherwise. But quantifying those harms in monetary terms is ultimately a fruitless task: Ms. Sow's conduct does not equate to a $3 million or $10 million fraud. For comparison's sake, the adjusted offense level of 28, which is what the Probation Office and the Government has calculated in this case, is higher than the offense level for crimes such as attempted murder (§ 2A2.1); robbery where the loss amount exceeds $9.5 million (§2 B3.1); keeping a person in involuntary servitude for over a year (§2 H4.1); and large-scale trafficking of firearms (§2K2.1).

## IV.    A non-incarceratory sentence will satisfy all the purposes of sentencing.

Here, I urge the Court to impose a non-incarceratory sentence. Such a sentence is far better tailored to satisfy *all* the purposes of sentencing than a term of incarceration:

*Punishment*: "When a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment. And as the Supreme Court has recognized, probation is *significant* punishment." *United States v. Leitch*, *et al.*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) (emphasis in original) (citing *Gall v. United States*, 552 U.S. 38, 48-49 (2007)). "In addition to standard and special conditions, there is an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and

---

[8] Available at: https://www.gao.gov/products/gao-10-423.

[9] Available at: https://www.lvmh.com/en/publications/2023-new-record-year-for-lvmh

Honorable Valerie E. Caproni                                                    Page 8
July 3, 2024

Re:       *United States v. Adama Sow*, 23 Cr. 593  (VEC)

sometimes even constructive) punishment without sending the defendant to prison." *Leitch*, 2013
WL 753445, at *12.

       The Court should also consider the extensive collateral consequences – both formal and
informal – that will attach to this conviction, affecting such things as where Ms. Sow can live
and what jobs she can get. *See generally United States v. Chevelle Nesbeth*, 188 F. Supp. 3d 179
(E.D.N.Y. 2016) (factoring in collateral consequences when imposing a non-incarceratory
sentence); *see also Utah v. Strieff*, 579 U.S. 232, 253 (2016) (Sotomayor, J. dissenting)
(describing how a criminal record results in the "'civil death' of discrimination by employers,
landlords, and whoever else conducts a background check."). These consequences fall heavier on
persons of color. *See generally* N.Y. Times Editorial Board, *Job Hunting with a Criminal Record*
(March 19, 2015) ("People with criminal records often face all manner of entrenched and
unjustified prejudice. Studies have found that job applicants who reported having a criminal
record were 50 percent less likely to receive a callback or job offer. And, as with virtually every
part of the criminal justice system, the effect was more pronounced when the job candidate was
black.")[10]; *Doe v. United States*, 168 F. Supp. 3d 427 (E.D.N.Y. 2016) (describing how a 13-
year-old conviction continued to have severe employment consequences for a 57-year-old
woman, for whom it was her only conviction).

       *Deterrence*: As demonstrated by Ms. Sow's otherwise exemplary life, and her perfect
conduct while on pre-trial supervision, an incarceratory sentence is not required to deter her from
future criminal conduct. Ms. Sow describes her deep remorse in her letter to the Court, and her
background and characteristics strongly suggests that the risk of recidivism here is
extraordinarily low. The low risk of recidivism in this case also has strong empirical support.
After analyzing sentencing data involving over 32,000 defendants, the Sentencing Commission
determined that individuals with no criminal history points had "considerably lower recidivism
rates than other offenders," thus leading to the 2023 Amendment for so-called zero-point
offenders. *See* U.S.S.G., *Amendments to the Sentencing Guidelines*, at 79-80.[11] Ms. Sow will
never commit another offense.

       Nor is incarceration necessary for the purpose of general deterrence, "a phenomenon that
is notoriously difficult (and perhaps impossible) to measure," see *United States v. Brady*, 2004
WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Evidence-based studies strongly support the
conclusion that it is the *certainty* of being prosecuted rather than the severity of punishment that
deters crime. *See* Nat'l Inst. of Just., *Five Things About Deterrence*, available at
http://nij.gov/five-things/pages/deterrence.aspx.[12]

---

[10] Available at: https://www.nytimes.com/2015/03/19/opinion/job-hunting-with-a-criminal-
record.html.

[11] Available at: https://www.ussc.gov/guidelines/amendments.

[12] The National Institute of Justice describes the "Five Things" series as a distillation of "what
we know from years of rigorous scientific inquiry," summarizing an "abundance of research,

Honorable Valerie E. Caproni                                                                Page 9
July 3, 2024

Re:          *United States v. Adama Sow*, 23 Cr. 593  (VEC)

*Incapacitation*: Ms. Sow poses no risk to any person, and does not need to be
incapacitated. In fact, the opposite is true. Society will best benefit from Ms. Sow remaining in
the community and laying the foundation for her future.

*Promoting Respect for the law*: Our requested sentence fundamentally promotes respect
for the law, because it is well-tailored to this offense and to Ms. Sow's unique characteristics.

* * *

Adama Sow is a 39-year-old woman who from a very young age has tried to help those
around her. She recognizes how serious her conduct was, and will do everything in her power to
make amends. Ms. Sow has demonstrated over the past eight months that she can succeed under
supervision, and does not need to be incarcerated for any purpose. Here, I urge the Court to
impose a non-incarceratory sentence, such as a term of probation, with a special condition that
Ms. Sow participate in mental-health treatment. (To the extent the Court believes a more punitive
sanction is required, a constructive sanction, such as community service, is far more appropriate
than a term of imprisonment.) Under the unique circumstances of this case, such a sentence will
best satisfy all the purposes of sentencing.

                                                        Respectfully submitted,


                                                        /s/_____

                                                        Martin S. Cohen
                                                        Ass't Federal Defender
                                                        Tel.: (212) 417-8737

Cc.     Henry Ross, Esq. by ECF

_____

analysis, testing and evaluation." *See* Nat'l Inst. Just., *NIJ "Five Things" Series*, available at:
http://nij.gov/five-things/Pages/welcome.aspx.

Exhibit A

June 26, 2024


Dear Judge Caproni,


     My name is Adama Sow. I'm writing this letter to take full responsibility for my actions which led to my arrest and the existing situation I'm facing. Words cannot not express the remorse I feel for the serious position I've put myself and my family in. I was aware that selling counterfeit was illegal however I didn't understand the full extent of its severity which nevertheless does not excuse my willing participation in it.

     As bad as it may sound, I am glad that these events have transpired because I can now focus on the right things. Per the words of Maya Angelou, "Do the best you can until you know better. Then when you know better, do better." I now know better, and I intend to do better. I vow to never put myself or any of my loved ones in such a position ever again. All this time I have been living for my family rather than myself, embodying my own and everyone else's struggles, taking it upon myself to make things always right. Now although I love them dearly it is time to take care of me. I've learned that everyone, myself included should always do the right thing because in this way there is no fear and the gamble of one's freedom is never worth it.

     In the past I used to work as a hairdresser specifically in braiding. After years of working constantly, every day of the year and years on end, the physical and mental burdens started to take a toll on me. I developed frequent hand swelling and infections forcing me to lose clients and therefore money that I desperately needed to take care of numerous responsibilities including my younger siblings as I was their guardian. For me braiding proved to be unlucrative and my struggles continued. Soon I was introduced to the counterfeit business and the subsequent events as we know led me further down into an unimaginable rabbit hole that caused me significant embarrassment and shame to my family.

     Since my arrest I've experienced periods of depression and anxiety not knowing what the future holds for me. I struggle to forgive myself for all the trouble that I've caused. Despite this I've tried to remain somewhat optimistic in my future. I have reconnected with certain family members recently and hope to continue doing the same. I have my granddaughter staying with me a few nights a week which helps brighten the nights. I've also always had a passion for acting and hope to pursue it further in the near future.


Sincerely,

Adama Sow

Exhibit B

June 12, 2024

Dear Judge Valerie E. Caproni,

My name is Kadiatou Sow. I am the younger sister of Adama Sow. I am currently working as a full-time Physician Assistant as well as studying as a part time MBA student.

Biologically, Adama and I are sisters but to me she represents a mother. She is around 11 years older than me, and so she has been instrumental in my upbringing from my initial years to adulthood. I cannot acknowledge any of my achievements today without first showing her gratitude. As cliché as it may sound, I wouldn't be the person I am today without her. I came to the United States at 8 years old. My sister was still only a teenager, but even at such a young age, she took the responsibility of raising me. She has fed me, clothed me, sheltered me, provided me with protection and most importantly nurtured me with the unconditional love that has molded me into the adult I am today.

I say Adama is like my mother because she possesses all the attributes of one and has always played the role well. Since elementary school whenever Mother's Day came about, I would gather all the small change I had collected to the day and purchase for her one of the plants being offered at school. One Mother's Day in particular, I also included a poem that I had written that followed the format of Maya Angelou's "Phenomenal Woman." Instead of ending each part with, "Phenomenal woman, That's me," I changed the refrain to "Phenomenal woman, That's you," because that's what she meant to me. To this day, I always do what I can to both honor and thank her for all she has done for me. The only thing that's changed is that since I got older, I get her flowers for Mother's Day instead.

At every turn she has always cheered me on, with every graduation big or small, at every theater performance or sports event. One fond memory, I vividly recall not wanting to attend my college graduation, as elaborate celebrations were never my thing. However, Adama deemed this unacceptable. That was another imperative milestone that she simply had to commemorate. Years ago, when I was very little and our family was still living in Guinea, Adama was the one who insisted that I attend school. In Guinea, especially back then, it was uncommon for girls to pursue an education. Girls would usually stay in the home until they were old enough to marry. Adama would not allow this to happen, so she enrolled me in school herself. All those years later, when graduation day came, I walked up the stage, both excited and frightened for the unknown that laid ahead, all I could hear was her cheers of delight which made all the difference in the world. I know she was so proud of me.

Adama is a loving selfless woman who has always worked tirelessly to always place the needs of others above her own. For me she sacrificed numerous ambitions, providing me with my basic needs as I pursed a full-time education without having to worry about how to take care of myself like so many others had to struggle with. She has constantly steered me toward success

and encouraged me to strive for the best. Although at the time it seemed more like a punishment, not being able to party and hang out with friends, it disciplined me and forced me to focus on my studies which has proved to be invaluable. I am completed indebted to her for life.

Although she made my childhood memorable, Adama unfortunately didn't have much of one herself. Faced with countless struggles, she has always had to fend for herself and others. She has never been able to get a formal education because she took the responsibility of taking care of our family. Our mother only has daughters, and in African cultures, a boy is presumed to be more valuable to a family. My mother named her Adama, a boy's name, due to a superstitious belief that the following child will be a male. Although my mother didn't get the male that she desperately craved for, in Adama she had the child that so many others can only dream of. Holding true to her name she takes care of her and the rest of us like no one else ever could. Through her I learned the importance of family and to always take care of one another. To this day, she is continuing to show her devotion to her family by helping me with my 2-year-old daughter since I work overnight. My girl loves her very much and even calls her grandma.

I've always known Adama to have an optimistic perspective on life. However, since this case, she's nothing but a remnant of herself, struggling to force a smile for the rest of us as she tries to be strong. When the events first unfolded, she would resist speaking to me and others on the phone, in the hopes that we would not notice the changes in her voice from crying. I've never known her to break into tears outside of family/friend's deaths, until the struggles of this case. Words can't express the sadness I feel watching her struggle.

Adama is a compassionate, considerate woman but like all humans she is not without flaws. Adama recognizes her mistakes, is remorseful for all the trouble she has caused and vows to never make the same mistakes again and instead will change herself and everything for the better. We've had our own relationship struggles but have reconnected of late. When at times it would go months before we would see or spoke to one another, now not a week will pass. With the conclusion of this case, Adama will continue to strive to reconnect with family and friends while maneuvering a new career path. I hope that she will pursue her education, because for her whole life she has been focusing on providing for the people she loves. It's time for her to focus on herself. And I of course will be available to walk with her every step of the way.

Sincerely,

Kadiatou Sow

Exhibit C

**From: Safiatou Sow**

**To: Judge Valerie E. Caproni**

**June 15, 2024**

**Dear Judge Caproni,**

I hope this letter finds you in good health and high spirits. I am writing this letter concerning my sister Adama Sow's case. My name is Safiatou Sow and I am Adama Sow' oldest sister. I graduated with my master's degree in social work from Fordham University at Lincoln Center in NYC in 2023. I'm currently working as a Mental Health Tech at Zucker Hillside Hospital in Queens.

My younger sister Adama remains the single strongest person that exemplifies such features. Even though I am older, my sister is my best friend and confidante. In a family of five, I am regarded as the middle child of my siblings, with my sister closely following me. Yet, we share a unique bond that started in childhood. Adama and I have fond memories that go way back to our childhood in Guinea. Whenever I came back home from school, she would always meet me at the driveway with smiles and hugs. Afterward, she would inform me about everything she did the whole day at home, including what she ate. Each day the small age gap between us started reducing and she turned into a good friend. Adama is kind-hearted and always makes herself available to offer assistance. The trait can be traced back to childhood when she grew up into a wholesome individual. I remember whenever I did some house chores, she would make herself ready to help. Whenever I was nagged about a task by our mother, including homework and duties within the house, Adama would tag along with her cheerful attitude and willingness to help.

Growing up, Adama faced social challenges that impacted her emotionally, which made it difficult for her to forge friendships with others in the neighborhood and at school. I believe it's because even though she was still very young, she was dealing with a lot of grown-up problems and responsibilities. Despite this, Adama was always dedicated, and this was reflected in her school and personal life. While dedication is regarded as a positive character, I believe she was misjudged by her peers as a socially awkward individual. The harsh perception may have hindered her full participation in other activities in school. I would sometimes find her staring at a group of peers playing around, while she sat close by.

Despite her challenges and her focus on her studies, Adama would always find time to laugh and be enthusiastic about life. Adama managed to withstand such issues by rising through the ranks in her school and by joining different clubs and groups such as volunteer and charity organizations in Conakry. Adama demonstrated resilience during this period, further demonstrating how strong she is as a person. I acted as her cheerleader and even encouraged her to strive for leadership positions available in the

clubs she had joined. Watching her grow into a respected character was such a joy to me.

Unfortunately, my sister Adama didn't have an opportunity to pursue a career as my other sisters and I have been able to do. She devoted herself to helping us instead of pursuing an education herself. I was working, going to school at night, and raising children. Without Adama, I would never have been able to accomplish this. She was there for us when we needed her. That is why we are there for her today when she needs us.

Even though Adama has a great personality, ever since she got in trouble with the law she has not been the same. Adama's mindset during this difficult period has demonstrated to me how strong she is because she did not wish to worry us with her own troubles. However, I was empathetic, and I pitied her more than she could ever know. I'm so afraid that she's going to experience mental illness sooner or later in her lifetime because of the consequences of her case. Every day I deal with people who experience mental disorders and I observe how sad it is. I don't want my sister Adama to go through these episodes. I have told her for a long time that she should consider seeing a therapist. She is resistant because our culture says it's not a good thing to do, that it is a sign of weakness. I am slowly helping her to find the courage to change her views as I believe she carries too much emotional weight with her.

Adama has displayed resilience, a desire to learn, and dedication in her journey to becoming better and establishing herself in this country. Her qualities are some of the ones that I strive to emulate. Even in her low moments, there is always something to learn. Sometimes I look back at our relationship and I feel elated about having my hero as a relative. With each passing day, we continue to strengthen our bond. Overall, my sister inspires me to be a better individual even amidst tribulations. I consider myself lucky to have her in my life.

I respectfully plead with you Judge Caproni to show mercy and leniency when you sentence Adama. Please, give my sister a second chance. It has always been a regret of hers that she never finished high school. She has never focused only on herself before. I believe she is ready to pursue a career, participate in a job training program, or go back to school. Whatever the case, I'm truly ready to help her in whatever she chooses to do.


Respectfully yours,
Safiatou Sow

Exhibit D

From:  Djenabou Diallo

To:     Judge Valerie E. Caproni

June 13, 2024

Dear Judge Caproni,

I am writing this letter to you on behalf of Adama Sow. My name is Djenabou Diallo and Adama is my aunt. I am currently a Legal & Compliance Associate at one of the top Asset Management Firms where my focus is on trade surveillance surrounding portfolio management and trading regulatory risks. I have known my aunt Adama basically my whole life and I have known her to be the most caring, loving, and courageous person in our family despite all her struggles growing up.

My aunt Adama has selflessly made sacrifices everyday just to make sure we had food on the table and for everyone else's goals and dreams in the family including mine and I would say this is all related to our upbringing. She is one of five girls who grew up without a father and a young mother who had no education and no job. My aunt selflessly decided to step up and be the father of the house. She has raised two of my younger aunts as her own for them to get an education and live out their dreams and today. Because of her they have their own careers.

I was born in Guinea and came to the States at a young age with my sister and my mother Safiatou (Adama's sister). At that time my mom was working, going to school to get an education, and also taking care of me and my sister. It was very difficult for her to manage. But my aunt Adama was the only one that helped my mom take care of us by watching over us and feeding us while my mother worked double shifts at night to provide for us. When we were short on rent, my aunt would chip in money so that we didn't end up on the street. She spent time with us to teach us English and took us to the park to play. Over time she became a second mother to us. At my own wedding, one of the most important days of my life, my mother was not there. However my aunt Adama stepped up and became my mother again and was there for me every step of the way. She always encouraged me to get an education, have goals and ambitions, be good to people, be the best I can be, believe in God and to do better for me and my generations to come.

Hearing about Adama's arrest was shocking. We were all very shaken up. Despite my surprise, I remembered back to all of the times that she was there for me in my life, and for that reason I decided that I would not judge her and instead would be there for her in whatever way I could help. I co-signed for her bond because I trust her, and she has not let us down. Since this case, she knows she can call me for help of any kind and that I will be there. I am always happy to help because of she has always been there for me without asking for anything in return.

So, in conclusion, I am pleading with you, Judge Caproni, to give my aunt the opportunity to finally take care of herself and live out her dreams the same way she's been taking care of others to help them live out their dreams. Every day I am living the impact this case has had on our family, and especially my aunt. She is in deep regret. She still does not have an easy time opening up about this case, and to me that shows how deeply ashamed she is for what she did. Adama has always been the strong one among us, so it has been devastating for us to see our loved one this way. Going forward we wish to help my aunt continue her education to get a degree, and eventually get job training and establish a career for herself. And we will all be there every step of the way to help her do it.


Thank you,

Yours Sincerely.
Djenabou Diallo