

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 31, 2025

**BY ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Adama Sow*, 23 Cr. 593 (VEC)

Dear Judge Caproni:

      The Government respectfully submits this letter in advance of the *Fatico* hearing (the "Hearing") in the above captioned case, which is scheduled for February 11, 2025, and pursuant to the Court's Orders dated September 30, 2024, (Dkt. 35), and January 27, 2025, (Dkt. 41).

      On March 21, 2024, defendant Adama Sow ("defendant" or "Sow") pleaded guilty to trafficking in counterfeit goods from a storage facility in Midtown Manhattan (the "Storage Facility" or "Facility"). Sentencing was scheduled for July 16, 2024. Prior to sentencing, the parties submitted sentencing submissions with divergent views on the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), specifically, the applicable enhancement under Section 2B1.1(b)(1) based on the value of the trafficked goods. This Court granted the defendant's application to adjourn the sentencing to allow the parties to confer and attempt to reach agreement on "the number and value of counterfeit goods appropriately attributed to the Defendant." (Dkt. 30). Following a change of counsel, and upon the defendant's application, this Court adjourned sentencing *sine die* and ordered a *Fatico* hearing on February 11, 2025. (Dkt. 35). The parties have conferred regarding their respective positions on the Guidelines, but have been unable to reach agreement. The Hearing ordered by the Court therefore remains necessary.

      The Government writes to set forth its view of the relevant facts and Guidelines analysis and to notify the Court of the anticipated testimony at the Hearing. For the reasons explained below, and as the evidence presented in the Hearing will demonstrate, the Government submits that the appropriate Guidelines range is 70 to 87 months' imprisonment.[1]

---

[1] In its July 3, 2024 sentencing submission, the Government calculated Sow's Guidelines range as 46 to 57 months. As discussed in Section II.a below, in preparing for the Hearing, the Government has developed evidence that Sow played an aggravating role in the offense by employing full-time

Page 2

## I.    Background and Guidelines Calculation

Sow used storage units on the sixth floor of the Storage Facility to traffic in counterfeit goods for at least six years, from approximately 2016 or 2017 until October 2023.  Each unit, sometimes called a "locker," was associated with a numbered entry gate.  In some cases, the interior walls separating two or more adjoining units were removed to create a single, contiguous space accessible via multiple gates.[2]

Beginning on October 20, 2023, law enforcement officers searched certain storage units inside the Storage Facility (the "October 2023 Seizures"),[3] including 15 storage units then controlled by Sow, and which were held in her name according to the Facility's records at the time of the seizure (the "Sow Units").  As part of the October 2023 Seizures, law enforcement officers also searched and recovered counterfeit goods from a sixteenth storage unit, Unit 61132, which was held in the name of one of Sow's employees at the time of the seizure (the "Sixteenth Unit"), and which the Government attributes to Sow based on her control of that unit.

In the Government's view, for purposes of the Guidelines calculation, Sow should be held accountable for the following:

a. The counterfeit goods seized from the 15 Sow Units during the October 2023 Seizures;

b. A reasonable estimate of the retail value of the counterfeit goods historically trafficked by Sow using 11 of the 15 Sow Units from at least November 2019 through April 2023, for the relevant period of time in which Facility records show that each of those Units was held in Sow's name; and

c. The counterfeit goods seized from the Sixteenth Unit during the October 2023 Seizures.

Consequently, under the Government's view of the Guidelines, Sow's base offense level is eight, pursuant to U.S.S.G. § 2B5.3(a).

Pursuant to U.S.S.G. §§ 2B5.3(b)(1)(B) and 2B1.1(b)(1)(K), a 20-level increase applies because the infringement amount—*i.e.*, the estimated retail value of the infringing items in the

---

workers to assist her in committing the offense, and the Government has revised its calculation of the Guidelines accordingly.

[2] The Sow Units are Units 61368 (combined with 61367), 61370 (combined with 61379), 61402, 61430, 61432 (combined with 61422 and 61423), 61433 (combined with 61420 and 61421), 61434 (combined with 61435), 61437 (combined with 61456 and 61455), 61438 (combined with 61454 and 61453), 61440 (combined with 61451 and 61450), 61442, 61443, 61459, 61467, and 61472 (combined with 61471).  A floorplan of the sixth floor of the Facility showing the Sow Units is attached hereto as Exhibit A.

[3] Law enforcement officers searched approximately 57 units, all but two of which contained counterfeit goods. In other words, not every unit searched is being attributed to Sow.

market in which they are sold[4]—was more than $9.5 million and less than $25 million over the course of the offense conduct.

Pursuant to U.S.S.G. § 3B1.1(c), because Sow played an aggravating role in the offense by acting as an organizer, leader, manager, and/or supervisor of fewer than five participants, a two-level increase applies.

After a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), Sow's total offense level is 27.[5] Sow has zero criminal history points, which places her in Criminal History Category I and results in a Guidelines range of 70 to 87 months' imprisonment.

The Government understands that Sow disputes each of the categories of counterfeit goods set forth above, with the exception of two of the Sow Units, Units 61432 and 61437, at which Sow was captured on video providing counterfeit goods to the manager of the Storage Facility. Thus, the parties principally dispute, *first*, "the degree of control [Sow] exercised over the storage units," *second*, "the quantity . . . of counterfeit goods attributable to her," and, *third*, the value of those counterfeit goods. (Dkt. 34 at 1). The Government further understands that Sow also disputes the application of a leadership enhancement.

## II. <u>Discussion</u>

### a. <u>The Degree of Sow's Control Over the Contested Storage Units</u>

The Government expects the testimony and evidence at the Hearing to demonstrate that Sow exercised complete autonomy over every aspect of the management of her storage units.

The Government expects to elicit testimony from two employees at the Storage Facility, who observed Sow's comings and goings daily. Those employees are expected to testify that Sow decided when and how she would occupy additional units: sometimes, she sought advance permission from Facility personnel to move in; other times, she took over units without asking, moving her counterfeit goods inside the unit and placing a padlock on the entry gate.

Those same witnesses are expected to testify that Sow handled Facility documentation, including lease agreements, for her units. Sow authorized or otherwise caused Facility personnel to generate lease agreements to reflect the units she controlled, and provided a name, address, and other information to be used on those agreements. Historically, Sow directed Facility personnel to use an alias, such as "Austin Williams" or "Terry Grant," in lease documentation generated by the Facility, and at least one employee of the Facility complied with those requests. In or around

---

[4] The Government does not dispute that, pursuant to application notes 2(A)-(C) to U.S.S.G. § 2B5.3, the infringement amount in this case is determined by the retail value of the *infringing* (*i.e.*, counterfeit) items, and not by the value of the *infringed* (*i.e.*, authentic) items.

[5] Because Sow receives an aggravating role adjustment pursuant to § 3B1.1, she is not eligible for an additional two-level reduction for being a qualifying zero-point offender. *See* U.S.S.G. § 4C1.1(a)(10).

January 2023, Sow asked for the units she controlled to be switched to her true name. Accordingly, a Storage Facility employee is expected to testify at the Hearing that he generated lease paperwork in the defendant's true name in or about early 2023 for every unit the defendant used at that time. In some cases, Sow signed a written agreement for a unit; often, however, the agreements remained unsigned and were saved in the Facility's internal recordkeeping system, storEDGE, for tracking purposes.

Sow handled payments for her units, typically by cash or money order that she provided directly to Facility personnel. Sow generally paid the Facility substantially less than what she owed for her units, prompting repeated attempts by Facility personnel to induce Sow to pay off her balance. Sow sought credits and discounts from Facility personnel in order to reduce the amount she owed.

The Government further expects to elicit testimony at the hearing that Sow oversaw the daily inflows and outflows of counterfeit goods to and from the Sow Units. She worked at the facility almost every day for many hours at a time,[6] meeting with customers—generally, street sellers and other downstream distributors of counterfeit goods—who visited her units to purchase goods. When shipments arrived, Sow directed others as to where those shipments should be stored.

Moreover, Sow enlisted one or more workers to assist her in her counterfeit trafficking operation. For example, the Government expects to elicit witness testimony that one of Sow's workers worked for her intermittently between approximately 2017 until the October 2023 Seizures, and that Sow paid him a weekly salary. The Government expects its witnesses will testify that Sow's workers appeared to take orders from Sow and performed menial tasks at her direction, such as moving and organizing boxes and interfacing with customers.

      b. The Quantity of the Counterfeit Goods

*First*, the Government expects to establish at the Hearing that the approximately 83,791 counterfeit goods seized from the 15 Sow Units during the October 2023 Seizures are in fact attributable to the defendant. As the testimony at the hearing will establish, during the time period leading up to the October 2023 Seizures, Sow was observed routinely entering and exiting the 15 Sow Units. These units, as is typical of units at the Facility, had locks placed on them by Sow, not by Facility personnel. The testimony will further establish that in or about June 2023—approximately four months before the October 2023 Seizures—the Storage Facility adopted a new software system, storEDGE, to maintain electronic records of lease agreements. As part of the Facility's transition to the new system, new lease agreements were generated for Facility units, including all the units that the Government attributes to Sow, and saved in the system as a record of the individual who controlled the unit at that time. The Government anticipates offering into evidence copies of the leases entered into the StorEDGE software system in June 2023, at the time of the transition, as well as copies of the leases generated by the Storage Facility in October 2023

---

[6] Based on the defense's representation that Sow does not dispute her frequent presence at the Facility, the Government does not presently intend to call an expert witness to interpret historical cell site data showing her presence at the Storage Facility. The Government reserves the right to notice and call such an expert in the event that the defense changes its position on this issue.

in response to the Government's subpoena for all lease paperwork attributable to Sow. Those leases reflect that the 15 Sow Units were held in Sow's true name, and that the Sixteenth Unit was held in the name of an individual who is known to have worked for Sow. The Government also anticipates offering into evidence Account Activity Summaries maintained by Facility personnel during the course of the offense, which reflect that Sow was the tenant of the 15 Sow Units at the time of the October 2023 Seizures, and had been for months prior. Finally, other internal records maintained digitally by the Storage Facility, such as billing records and tenant account histories, reflect that Sow was the most recent tenant of the 15 Sow Units prior to the October 2023 Seizures.

*Second*, the Government expects to establish at the hearing that Sow trafficked in significant quantities of counterfeit goods in the years leading up to the seizures, from at least November 2019 through October 2023,[7] which are appropriately included in the Guidelines calculation for the total value of counterfeit goods attributable to Sow. *See, e.g.*, *United States v. Blount*, 291 F.3d 201, 215–16 (2d Cir. 2002) (upholding district court's determination and inclusion of drug quantity extrapolated from evidence of estimated weekly drug sales). The Government expects to offer evidence that the value of counterfeit goods that Sow historically trafficked totals at least $3 million—and likely far more[8]—on the basis of (i) her yearslong use of certain of the Sow Units, as reflected by Facility records; (ii) her weekly receipt of a high volume of counterfeit goods deliveries throughout the relevant time period; and (iii) her bank account records, which show, among other things, that in a period of only six months in 2021 (when Sow was controlling approximately eight of the Sow Units), Sow received and transferred approximately $3 million into and out of an account held in her name alone.[9]

*Third*, the Government expects to establish at the hearing that the approximately 1,723 counterfeit goods seized from the Sixteenth Unit during the October 2023 Seizures are likewise attributable to Sow. The Government expects to elicit witness testimony that one of Sow's workers leased the unit on behalf of Sow. The most recent lease documentation for the Sixteenth Unit bears the name of that worker, and earlier lease documentation for the Sixteenth Unit bears Sow's name.

    c. <u>The Value of the Counterfeit Goods</u>

At the hearing, the Government expects to call a brand expert witness to testify to the range (low, average, and high) of potential street values for each brand and product ("brand-product

---

[7] The Government has not been able to obtain records reflecting Sow's control of storage units prior to November 2019, and therefore is not seeking to hold Sow accountable for the counterfeit goods she trafficked prior to November 2019.

[8] The Government is preparing, and will present at the Hearing, a detailed proposed calculation methodology based on the anticipated evidence and testimony discussed in this paragraph.

[9] Sow's only identified sources of income were: (i) $3,000 per month of rental income (PSR ¶¶ 57, 59), and (ii) from 2015 until 2020, unspecified income from an unidentified hair braiding business, the name and location of which Sow could not recall, and which the Probation Department could not verify, (PSR ¶ 58).

category") of counterfeit goods seized during the October 2023 Seizures. The brand expert's estimated ranges of street values will be based on, among other things, his experience conducting undercover buys of counterfeit goods of the same type and general quality as the sampling of seized goods that he inspected. The low-end valuation is the lowest price for which a counterfeit item of a particular brand-product category would sell; the high-end valuation is the highest price for which such a counterfeit item would sell; and the average is the mean of the low- and high-end valuations. This witness is anticipated to testify to the factors that influence the street price of a particular counterfeit item, including, among other things, the type of product, the brand, the condition of the item, the sale value of the authentic version of the product, and the relative sophistication of the buyer and seller. The expert is anticipated to further testify that the total estimated average "street" value of the seized goods attributable to Sow is $7,510,395, as set forth in the spreadsheet attached hereto as Exhibit B.

The brand expert witness is further expected to testify that the seized goods that he inspected generally were wrapped, packaged, and in mint condition, unlike many counterfeit goods sold on the street. Accordingly, the Government submits that, at a minimum, the Court should adopt the average valuations provided by the brand expert witness.[10]

Using (i) the average valuations of the goods seized from the 15 Sow Units, (ii) a reasonable estimate of the goods trafficked by Sow using the Sow Units between 2019 and 2023, and (iii) the average valuations of the goods seized from the Sixteenth Unit, the total value of the goods attributable to Sow is more than $10.5 million, as set forth in the chart below.

| Category | Approx. street value (average) |
|---|---|
| Goods seized from the 15 Sow Units (October 2023) | $7,333,247 |
| Goods trafficked by Sow using the Sow Units (2019-2023) | At least $3,000,000 |
| Goods seized from the Sixteenth Unit (October 2023) | $177,147 |

Accordingly, this Court should apply the 20-level increase.

### III.     Scope of the Hearing

At this time, the Government anticipates calling the following witnesses at the Hearing:

- Fernando Velazquez, manager of the Storage Facility;
- Thomas Velazquez, assistant manager of the Storage Facility;
- Homeland Security Investigations Special Agent Kenneth Nichols;
- Michael Rieger, Senior Investigator, IP House; and

---

[10] Based on the above-average condition of the goods, the Government believes that valuations closer to the brand expert's high-end valuations would most accurately reflect the goods' value. Nonetheless, for purposes of calculating Sow's Guidelines range, it is immaterial whether this Court adopts the high-end valuation or average valuation, as Sow's Guidelines calculation is identical under either standard.

- A summary witness from the U.S. Attorney's Office who will review the documentary evidence linking the defendant to each unit.

The Government also expects to introduce a variety of documentary evidence, including, among other things:

- Lease paperwork from the Storage Facility for each of the units used by Sow, including lease agreements from June 2023 and October 2023 bearing Sow's true name;
- Account Activity Summaries from the Storage Facility's software system for each of the units used by Sow, with dated entries for events spanning Sow's tenancy of the unit;
- Billing histories from the Storage Facility's software system for each of the units used by Sow;
- Metadata for the lease paperwork referenced above, from the Storage Facility's software system;
- Photographs of the units used by Sow, including photographs taken at the time of the October 2023 Seizures;
- A floorplan of the sixth floor of the Storage Facility, where all of the Units used by Sow were located; and
- Bank records for certain of Sow's bank accounts.[11]

Respectfully submitted,

DANIELLE R. SASSOON
United States Attorney

By: _____
Sarah Mortazavi / Henry L. Ross
Assistant United States Attorneys
Tel: (212) 637-2520 / 2442

cc: Justine Harris, Esq. (by ECF)

---

[11] The Government understands that the defense intends to stipulate to the authenticity of these and other business records that the Government will seek to admit at the Hearing.