**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

       v.                                                    23 Cr. 593 (VEC)

ADAMA SOW,

                   Defendant.

**SENTENCING MEMORANDUM OF ADAMA SOW**

Justine A. Harris
Emily A. McDaniels
Alexandra Conlon
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
jharris@shertremonte.com

*Counsel for Adama Sow*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................iii

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................. 4

      A.     Ms. Sow's Childhood in Guinea ........................................................... 4

      B.     Ms. Sow Escapes to the United States and
            Takes on a Parental Role for Her Sisters ............................................... 6

      C.     Ms. Sow's Continued Importance in Her Family ................................... 7

      D.     The Psychological Scars from Ms. Sow's Childhood............................ 10

III.   THE OFFENSE, MS. SOW'S GUILTY PLEA, AND THE *FATICO* HEARING .......... 12

      A.     Gotham Records................................................................................... 13

      B.     The Expert Testimony.......................................................................... 16

IV.    THE GOVERNMENT FAILED TO ESTABLISH THE SENTENCING
      ENHANCEMENTS BY A PREPONDERANCE OF THE EVIDENCE ........................ 19

      A.     The Court Cannot Credit the Testimony of the Velazquez Brothers...................... 21

      B.     The Two-Level Leadership Enhancement Does Not Apply,
            and Ms. Sow Should Receive the Zero-Point Offender Reduction ..................... 23

      C.     Gotham's Records Are Insufficient to Connect Ms. Sow
            to the 16 Units the Government Seeks to Attribute to Her ................................... 28

      D.     The Government Cannot Sustain Its Burden of Proving
            the Retail Value of the Counterfeit Goods ........................................... 31

      E.     There Is No Basis for Further Enhancing Ms. Sow's Guidelines
            Through a Historical Projection............................................................. 37

      F.     The Appropriate Advisory Guidelines Range is 18 to 24 Months ....................... 40

V.     THE COURT SHOULD SENTENCE MS. SOW TO TIME SERVED .......................... 41

      A.     Ms. Sow's Trauma History Warrants Leniency
            and Counsels Against Incarceration...................................................... 42

B.    The Court Should Consider Ms. Sow's History of Good Deeds
      and that Any Term of Imprisonment Would Impose
      Undue Hardship on her Family. ............................................................................ 48

C.    The Guidelines Range Advanced by the Government
      is Greater Than Necessary to Reflect the Seriousness
      of the Offense and Promote General Deterrence .................................................... 49

D.    A Guidelines Range Recommending a Custodial Sentence
      is in Conflict with 28 U.S.C. § 994(j), which Directs the Court
      to Impose a Sentence Other than Imprisonment .................................................... 52

VI.    CONCLUSION ............................................................................................................ 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*

    552 U.S. 38 (2007) .................................................................................................. 41

*Loper Bright Enterprises v. Raimondo,*

    603 U.S. 369 (2024) ........................................................................................... 53, 54

*Pepper v. United States,*

    562 U.S. 476 (2011) .............................................................................................. 41

*Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.,*

    42 F.4th 67 (2d Cir. 2022) ..................................................................................... 53

*Tedone v. H.J. Heinz Co.,*

    686 F. Supp. 2d 300 (S.D.N.Y. 2009) .................................................................. 36

*United State v. Rivera,*

    192 F.3d 81 (2d Cir. 1999) ..................................................................................... 43

*United States v. Adelson,*

    441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................................. 48

*United States v. Alba,*

    933 F.2d 1117 (2d Cir. 1991) ................................................................................ 48

*United States v. Archer,*

    671 F.3d 149 (2d Cir. 2011) ............................................................................. 19, 37

*United States v. Brady,*

    417 F.3d 326 (2d Cir. 2005) ................................................................................... 43

*United States v. Burgos,*

    324 F.3d 88 (2d Cir. 2003) ................................................................................. 24

*United States v. Collado,*

    No. 01-cr-1103-02, 2006 WL 2872593 (S.D.N.Y. Oct. 10, 2006) ........................... 55

*United States v. Coppola,*

    671 F.3d 220 (2d Cir. 2012) ........................................................................... 20, 32

*United States v. Cosme,*

    No. 06-cr-608, 2010 WL 276599 (E.D.N.Y. Jan. 19, 2010) ................................... 55

*United States v. D.W.,*

    198 F. Supp. 3d 18 (E.D.N.Y. 2016) ................................................................... 46

*United States v. Danilow Patry Co., Inc.,*

    563 F. Supp. 1159 (S.D.N.Y. 1983) ................................................................... 51

*United States v. Fatico,*

    458 F. Supp. 388 (E.D.N.Y. 1978) ..................................................................... 20

*United States v. Fatico,*

    579 F.2d 707 (2d Cir. 1978) ............................................................................. 20

*United States v. Fernandez,*

    No. 12-cr-844, 2015 WL 1542026 (S.D.N.Y. Apr. 6, 2015) ................................... 54

*United States v. Gonzalez,*

    945 F.2d 525 (2d Cir. 1991) ............................................................................. 46

*United States v. Greenfield,*

    44 F.3d 1141 (2d Cir. 1995) ............................................................................. 23

*United States v. Harding,*

    273 F. Supp. 2d 411 (S.D.N.Y. 2003) .................................................................. 22

*United States v. Hernandez,*

    No. 1:03-cr-01257, 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ........................... 55

*United States v. Kent,*

    821 F.3d 362 (2d Cir. 2016) ................................................................................. 19

*United States v. LaBonte,*

    520 U.S. 751 (1997).............................................................................................. 52

*United States v. Martinez,*

    413 F.3d 239 (2d Cir. 2005) ............................................................................ 20, 26

*United States v. McGregor,*

    11 F.3d (2d Cir. 1993) ......................................................................................... 24

*United States v. Pauling,*

    924 F.3d 649 (2d Cir. 2019) ............................................................................ 37, 38

*United States v. Sampel,*

    860 F. App'x 789 (2d Cir. 2021) ...................................................................... 23, 24

*United States v. Sarcia,*

    No. No. 3:19-cr-64, 2022 WL 17546758 (D. Conn. Dec. 9, 2022) ......................... 38

*United States v. Sawyer,*

    672 F. App'x 63 (2d Cir. 2016) ............................................................................. 42

*United States v. Seemongal,*

    No. 10-cr-70, 2012 WL 4049594 (E.D.N.Y. Jan. 10, 2010) .................................. 48

*United States v. Shonubi,*

    103 F.3d 1085 (2d Cir. 1997) ........................................................................ 37

*United States v. Shonubi,*

    998 F.2d 84 (2d Cir. 1993) ............................................................................ 37

*United States v. Si Lu Tian,*

    339 F.3d 143 (2d Cir. 2003) .......................................................................... 27

*United States v. Singh,*

    877 F.3d 107 (2d Cir. 2017) .......................................................................... 41

*Yates v. United States,*

    574 U.S. 528 (2015) ...................................................................................... 53

**Statutes**

18 U.S.C. § 16 .................................................................................................... 53

18 U.S.C. § 2320 ........................................................................................... 12, 54

18 U.S.C. § 3553(a) .............................................................................. 41, 48, 56

18 U.S.C. § 3582 ................................................................................................ 42

28 U.S.C. § 994(j) .............................................................................................. 52

**Rules**

U.S.S.G. § 2A2.1 ............................................................................................... 51

U.S.S.G. § 2B1.1 .......................................................................................... passim

U.S.S.G. § 2B5.3(a) ................................................................................ 31, 40, 41

U.S.S.G. § 3B1.1(c) ............................................................................ 2, 19, 23, 27

U.S.S.G. § 3E1.1 ................................................................................................ 40

U.S.S.G. § 4C1.1 ................................................................................... 2, 27, 40

# I.

## INTRODUCTION

Adama Sow's early life in Guinea, West Africa was marked by poverty, brutal and ███████████████, and neglect. One of five daughters, Ms. Sow was forced to begin supporting her family in elementary school. At age sixteen, she escaped to the United States, soon bringing three of her sisters so that they would not have to endure the same horrors she did. Since arriving in this country, she has worked tirelessly to protect and provide for her family, seeking to achieve a sense of stability and security that she never had as a child. Selling counterfeit bags and accessories was just one of the ways Ms. Sow managed to earn a living and support her family. She turned to the counterfeiting business after suffering a debilitating injury working as a hair stylist that prevented her from continuing her stylist work. But she understands that she had other options and offers no excuse for her conduct. Indeed, she is deeply ashamed. She knew then, and knows now, that it was wrong and profoundly regrets her actions.

Ms. Sow is a fundamentally good person and a caretaker at heart, but her untreated mental health conditions stemming from severe ██████████ she endured as a child have impaired her decision-making as an adult. She is only now beginning to face and understand the extent to which her experiences of childhood abuse have driven and affected her. Accordingly, regardless of the ultimate findings made by the Court with respect to the applicable Guidelines, any prison term would be unwarranted. Ms. Sow needs mental health treatment, not incarceration, and neither the public interest nor the goals of sentencing would be served by jailing her.

As the Court knows, the parties vigorously dispute the scope of Ms. Sow's criminal conduct, as well as the applicable Guidelines. At the *Fatico* hearing,[1] the government sought to establish that Ms. Sow was responsible for selling counterfeit goods with a retail value in excess of $10 million, warranting a 20-point enhancement under U.S.S.G. § 2B1.1. This calculation is based on the government's claims that (1) Ms. Sow was responsible for roughly 85,000 counterfeit goods seized from sixteen storage units, with an estimated retail value of $7.5 million; and (2) some unspecified estimate of her purported "historical" counterfeit trafficking conduct, which it claims was worth at least $3 million. Abandoning its Guidelines estimate in the *Pimentel* letter, the government now asserts that Ms. Sow's offense level should be further enhanced by two points because she supposedly had an "employee," making her a "supervisor" or "manager" under U.S.S.G. § 3B1.1(c), which would deprive her of the zero-point offender reduction under U.S.S.G. § 4C1.1. The government is advocating for an adjusted offense level of 27, corresponding to a recommended Guidelines range of 70 to 87 months.

Yet in every respect, the government has failed to satisfy its burden of proof to warrant these enhancements and justify its sentencing recommendation. The two informants who testified at the *Fatico* hearing either recounted unreliable hearsay or were patently incredible, making clear that the quantity of goods attributable to Ms. Sow was wildly exaggerated and that no reliable evidence substantiated the 11th-hour claim that Ms. Sow was a "leader" under U.S.S.G. § 3B1.1(c). Moreover, while the parties offered conflicting expert testimony, both witnesses agreed that the value of counterfeit goods is driven by their quality and how closely they resemble authentic products. A close review of the actual items seized makes clear that they were

---

[1] The record from the *Fatico* hearing contains the exhibits introduced by both parties during the hearing itself, as well as exhibits admitted into evidence by the defense on March 24, 2025.

at the lowest end of the quality spectrum and therefore merit nothing but the lowest retail value estimate.

As explained in further detail below, because the government has failed to sustain its burden of proving any Guidelines enhancement, Ms. Sow's recommended Guidelines should be eighteen to twenty-four months imprisonment, corresponding to the "low" estimate of the retail value of the goods seized from the two storage units associated with Ms. Sow in the undercover buy videos.[2]  However, regardless of the Court's ultimate findings on the Guidelines, there is no reason to sentence Ms. Sow to anything more than time served. She poses no risk of recidivism, any term of incarceration would severely disadvantage her close-knit family, including the two-year old niece she cares for, and the mental health treatment Ms. Sow so desperately needs would be unavailable in a carceral setting. Beyond that, a jail sentence is not needed to achieve either general or individual deterrence or promote respect for the law. In short, any term of incarceration would be greater than necessary to serve the goals of sentencing and risks worsening Ms. Sow's serious mental health conditions.[3]

---

[2] Both the October 10 and October 16 undercover buy recordings show Ms. Sow's purported association with unit 61432. Gov't Ex. 834, at 0:50 (October 10 recording); Gov't Ex. 801, at 1:32 (October 16 recording). The October 16 undercover buy recording shows Ms. Sow's purported association with unit 61441. Gov't Ex. 801, at 1:29.

[3] In support of our request for a variance, we attach: a Psychological Evaluation of Ms. Sow, completed by Dr. Adeyinka Akinṣulurẹ-Smith, as Exhibit A (under seal); a letter from Ms. Sow, as Exhibit B; and letters from friends and members of Ms. Sow's family, as Exhibits C-1 to C-4.

## II.

## BACKGROUND

### A.  Ms. Sow's Childhood in Guinea

Ms. Sow was born in Conakry, Guinea in 1985. PSR ¶ 38. During Ms. Sow's childhood, Guinea was plagued by political and social turmoil, and women and girls were particularly vulnerable to poverty and oppression. *See* BTI Transformation Index, *Guinea Country Report 2024* (2024), https://bti-project.org/en/reports/country-report/GIN#:~:text=As%20the%20Cold%20War%20raged,Africa%20with%20Ghana%20and%20Mali. Ms. Sow's family was no exception. Ms. Sow's father abandoned the family when she was approximately five years old. *Id.* ¶ 40. Ms. Sow's mother was left to raise their five daughters alone; they lived in a small home without electricity or running water. *Id.* ¶¶ 38, 40. To support the family financially, Ms. Sow's mother made sweets for Ms. Sow to sell on the street after school—even though she was only a child, Ms. Sow quickly became the family's primary source of income. *Id.* ¶ 40. The proceeds were rarely sufficient to sustain the family, and they often had to make do with one meal a day. *Id.*

Sexual and gender-based discrimination and violence were, and continue to be, widespread in Guinea. Amnesty International has reported that 49.7% of Guinean women have experienced sexual violence, and 75% of sexual assault victims were younger than eighteen years old, while their perpetrators were adult men. Amnesty Int'l, *Guinea: Shame Must Change Sides: Ensuring Rights and Justice for Victims of Sexual Violence in Guinea* (Sept. 27, 2022), https://www.amnesty.org/en/documents/afr29/5410/2022/en/. Forced marriages and female genital mutilation—a procedure involving the "partial or total removal of the female external genitalia or other injury to the female genital organs for non-medical reasons"—are routine. *Id.*;

4

UNICEF, *What Is Female Genital Mutilation*, https://www.unicef.org/protection/female-genital-mutilation (last accessed April 3, 2025).



Ms. Sow largely kept these horrific experiences secret, both because no one ever believed her or simply blamed her when she tried to report inappropriate conduct, and because she feared the harm her abusers would inflict on her and her family if she reported them.

**B.  Ms. Sow Escapes to the United States and Takes on a Parental Role for Her Sisters**

When Ms. Sow was sixteen years old, someone who learned of Ms. Sow's ██████████ ██████ helped her obtain the resources to flee to the United States. *See* Ex. A, at 4; PSR ¶ 43. Desperate to escape the near-constant assaults and build a better life for herself, Ms. Sow arrived in New York in 2002 with only $20 in her pocket. PSR ¶ 43; Ex. A, at 4. With nowhere to go and no funds, Ms. Sow began her new life in New York homeless—she slept on the subway for several months. PSR ¶ 43; Ex. A, at 4.

Yet Ms. Sow was determined to succeed. She got a job working as an African hair braider. PSR ¶ 43; Ex. A, at 4. Eventually, Ms. Sow connected with some distant relatives, who let her stay with them and get settled. PSR ¶ 47. However, Ms. Sow never forgot the family she had left behind in Guinea and worried constantly about the challenges her sisters faced in her absence, both because she had been the family's primary breadwinner and because she feared they would suffer the ████████████████████████ Ms. Sow regularly sent money

---

[4] Ms. Sow and her family are devout Muslims, and they view the use of drugs and alcohol as strictly forbidden by their religion. *See* PSR ¶ 42; Ex. A, at 4.

home to Guinea, and she was ultimately able to bring her sisters, one by one, to the United States. Ex. A, at 4.

Despite only being a teenager herself, Ms. Sow raised her younger sisters—who were approximately eight and ten years old when they arrived in the United States—making sure they had food, clothes, and a safe home. Ms. Sow hoped to give them every opportunity she lacked growing up, and despite being too young to be their legal guardian, she enrolled them in New York City public schools. *Id.* Ms. Sow's effort, support, and love for her family enabled them to all thrive. Her sister, Kadiatou, explains that "[Ms. Sow] has fed me, clothed me, sheltered me, provided me with protection, and most importantly, nurtured me with the unconditional love that has molded me into the adult I am today." Ex. C-1, Ltr. from Kadiatou Sow. One of Ms. Sow's nieces, Djenabou, explains that Ms. Sow "raised two of my younger aunts as her own . . . . Because of her they have their own careers." Ex. C-3, Ltr. from Djenabou Diallo. Ms. Sow's long-time friend, Fatima, observed firsthand that "[e]ven though [Ms. Sow] was young, . . . [she] did everything she could to raise [her sisters] in a loving, supportive, and safe family." Ex. C-4, Ltr. from Fatima Balde. Put simply, Ms. Sow took on the obligations of a parent, raising her sisters as if they were her children, even though she was still just a child herself.

### C.  Ms. Sow's Continued Importance in Her Family

Even after her younger sisters became adults, Ms. Sow continued to take on a matriarchal role in the family. In myriad ways, she ensured the wellbeing of her sisters, and in recent years, their children. *See* Ex. A, at 4-5. To support her family financially, Ms. Sow continued braiding hair, both at a salon and for private customers, and she also sold T-shirts through one of her salon

contacts. *Id.* at 5; PSR ¶ 43.[5] She and her sisters pooled their finances to purchase real estate so they could have consistent rental income. *See* PSR ¶ 59.

  Unfortunately, as time went on, it became increasingly difficult for Ms. Sow to make ends meet. The physical demands of her hair-braiding business caught up with her. The harsh chemicals used for hair treatments burned Ms. Sow's hands, causing lasting pain and swelling. Ex. A, at 6; Ex. B, Ltr. from Adama Sow. She struggled to offer the same quality of service to her customers and lost business and income that was critical to her and her sisters' survival. *See* Ex. B, Ltr. from Adama Sow. Compounding these problems, one of her tenants stopped paying rent, directly hindering Ms. Sow's ability to pay the mortgage on the property she and her sisters owned. PSR ¶ 59(ii). A contact from the salon business, who had previously brought Ms. Sow into a T-shirt business, offered Ms. Sow the opportunity to work with him on another business: selling counterfeit luxury goods. Looking for income and a job that would not further injure her hands, Ms. Sow agreed to join the counterfeiting business that led to her arrest.

  The sacrifices Ms. Sow has made for her family are profoundly appreciated, and each of them attributes their successes in life to Ms. Sow's unwavering support. Djenabou, Ms. Sow's 26-year-old niece, recalls that when she was little, her "aunt Adama was the only one that helped my mom take care of us by watching over us and feeding us while my mother worked double shifts at night to provide for us. When we were short on rent, my aunt would chip in money so that we didn't end up on the street." Ex. C-3, Ltr. from Djenabou Diallo. Djenabou sees Ms. Sow as a "second mother." *Id.* Similarly Ms. Sow's sister, Safiatou, writes that:

> Adama devoted herself to helping us instead of pursuing an education herself. I was working, going to school at night, and raising children. Without Adama, I

---

[5] Ms. Sow stored these T-shirts in a storage unit at Gotham Mini Storage, the storage facility at issue in this case.

> would never have been able to accomplish this. She was there for us when we
> needed her. That is why we are there for her today when she needs us.

Ex. C-2, Ltr. from Safiatou Sow. Safiatou, who went on to get a master's degree in social work

and now works as a mental health technician at Zucker Hillside Hospital, feels "elated" to have

Ms. Sow as "[her] hero." *Id.* Ms. Sow's youngest sister, Kadiatou, who graduated from college

and is a part-time MBA student, while also working as a full-time physician's assistant, explains

that "[Ms. Sow] has constantly steered me toward success and encouraged me to strive for the

best. . . . I am completely indebted to her for life." Ex. C-1, Ltr. from Kadiatou Sow.

Now, Ms. Sow supports her family by taking care of Kadiatou's daughter—Ms. Sow's

niece, who views Ms. Sow as her grandmother because of Ms. Sow's role in her life and in

Kadiatou's life. *Id.* As Kadiatou explains in her letter:

> Adama was crucial to my upbringing and now she is invaluable to my toddler's as
> well, as I have come to depend on her for my childcare needs. Adama has become
> an irreplaceable part of my child's life, providing not only safe and reliable care
> but also a nurturing and loving environment that strengthens my child's growth
> and well-being. My child has developed an unbreakable bond with her as she
> sweetly knows and refers to Adama as grandma. As a PA working 12-hour shifts
> and with rotating days throughout the week, my schedule often requires me to rely
> on Adama to ensure that my child is well cared for in my absence. She cares for
> her as her own with patience and genuine affection which has given me the peace
> of mind that every parent dreams of.

*Id.* Ms. Sow has benefitted equally from caring for her niece. By taking care of her niece and

building a close relationship with her, Ms. Sow has found a lawful way to provide for her family

while nurturing some of her wounds. For Ms. Sow, taking care of her niece has become a fresh

start, one that gives her a "profound sense of purpose and obligation" and helps "[fill] a void" in

her life. Ex. B, Ltr. from Adama Sow. The opportunity to care for a young child—by choice and

not out of fear for their safety—has been radically transformative for Ms. Sow. It drives her to be

a "positive role model, someone [her niece] can rely on and learn from, rather than a reminder of

past mistakes." *Id.*

**D.  The Psychological Scars from Ms. Sow's Childhood**

## III.

## THE OFFENSE, MS. SOW'S GUILTY PLEA, AND THE *FATICO* HEARING

Ms. Sow pleaded guilty to one count of trafficking in counterfeit goods under 18 U.S.C. § 2320. ECF No. 18. At the change of plea, Ms. Sow fully admitted her conduct and expressed her deep remorse in getting involved with the counterfeiting business. *See* ECF No. 19, at 19. Given the parties' disagreements regarding the quantity of counterfeit goods that could be attributed to Ms. Sow, as well as their corresponding retail value under the applicable Guidelines, Ms. Sow pleaded guilty without a plea agreement. *See* ECF No. 18.

To address the parties' disputes, the Court held a two-day *Fatico* hearing on February 11 and 12, 2025. *See* ECF Nos. 47-48. At the hearing, the government principally relied on the testimony of two brothers, Thomas Velazquez ("Thomas") and Fernando Velazquez ("Fernando"), Gotham Mini Storage's assistant manager and manager, respectively. Both Velazquez brothers were paid by law enforcement for their work on this case. While Thomas received a one-time "gift" of $2,500, Hr'g Tr. Day 1, at 74, 81, Fernando has worked as a government confidential informant for over twenty years, was paid more than $12,500 in connection with this case, and has been paid over $150,000 for his work with law enforcement over the course of his lifetime. *Id.* at 140-41.

According to the brothers, Gotham was a hub for counterfeit trafficking. More than twenty people—almost all African immigrants—were selling counterfeit accessories out of different storage units. *Id.* at 92, 122. Each was "hustling for their own business," and sold their goods in bulk to street vendors, who in turn sold the goods on street corners and at street markets, such as Canal Street. *Id.* at 79, 127, 175 (agreeing that "most of [Ms. Sow's] customers . . . sell on Canal Street"). The counterfeit activities at Gotham came to a standstill when

government agents executed multiple warrants in October 2023, seizing approximately 219,000 counterfeit products from tens of storage units over the course of four days. *See id.* at 11; U.S. Attorney's Office, S. Dist. of N.Y., *Largest-Ever Counterfeit Goods Seizures Result in Trafficking Charges Against Two Individuals* (Nov. 15, 2023), https://www.justice.gov/usao-sdny/pr/largest-ever-counterfeit-goods-seizures-result-trafficking-charges-against-two.

The government also elicited testimony from both Thomas and Fernando that Ms. Sow employed an unnamed, white-haired "Albanian" or "Lebanese" man up to seven days a week and that she paid him $700 to $1,000 per week. *See* Hr'g Tr. Day 1, at 17-19, 77-78, 99, 193. This man is clearly visible in the undercover buy video recorded by Fernando in October 2023, *see* Gov't Ex. 801, yet on that video, he does not interact at all with Ms. Sow and instead appears to be completing a deal with another individual, accepting a sizable amount of cash. *Id.* at 2:39; Hr'g Tr. Day 1, at 153. Fernando further claimed at the hearing that two others seen on the video—a "tall Black man" and a woman he referred to as Ms. Sow's "sister"[6] (Sokhna Mai Dieng)—were also Ms. Sow's employees. Hr'g Tr. Day 1, at 97, 103, 155. While Thomas also claims that the Albanian man was Ms. Sow's employee, his understanding was based on pure hearsay, and he had no personal knowledge whether it was in fact true. *Id.* at 78.

## A. **Gotham Records**

In an effort to hold Ms. Sow responsible for approximately 85,000 of the goods that were seized, and to substantiate its allegation that she had been trafficking counterfeit goods since 2019, the government introduced a vast swath of Gotham documents, including approximately

---

[6] While Fernando at first testified that Ms. Dieng was Ms. Sow's actual "sister," he admitted on cross-examination that he and many of the investigation targets colloquially called each other "brother" or "sister," but the terms did not actually signify any familial relationship. Hr'g Tr. Day 1, at 122, 177. Moreover, Fernando later acknowledged that he did not believe Ms. Dieng was Ms. Sow's biological sister. *Id.* at 203.

fifty storage unit lease agreements, various account summaries and logs, as well as billing histories. *See* Gov't Exs. 101A-117C, 201-212, 251A-266, 301-316B, 401-414, 501-502, 601-604. These documents were created by the Velazquez brothers, and despite being associated with two different software platforms—Yardi and storEDGE—none had any metadata. *See* Hr'g Tr. Day 1, at 131; Hr'g Tr. Day 2, at 235.

Roughly three different types of lease agreements were introduced into the record. First, the government introduced a handful of unsigned lease agreements and addenda dated between March 2023 and May 2023. *See* Gov't Exs. 104A, 104B, 105A, 105B, 107A, 107B, 108A, 108B, 109A, 109B, 110A, 110B, 112A, 112B, 113A, 113B, 114A, 114B, 116A, 117A, 117B. These contracts were supposedly filled in using the Yardi system and kept in hard copy. Hr'g Tr. Day 1, at 107. Second, on June 6, 2023, Gotham switched from the Yardi system to a new tenant management system called storEDGE. *E.g.*, *id.* at 20. The storEDGE system generated new rental contracts to replace the prior Yardi contracts and was used to create contracts after that date. *Id.* at 30; *see* Gov't Exs. 101A, 101B, 103C, 105C, 106A, 111A, 111B, 115B. While the billing records and account summaries from storEDGE purport to associate Ms. Sow with sixteen storage units, both Fernando and Thomas confirmed that these account records could be easily changed manually to reflect different names or contact information. Hr'g Tr. Day 1, at 48-49, 129-30. Indeed, Fernando at one point had even offered to put a storage unit in a target's name to strengthen the agents' investigation. *Id.* at 130 ("Q: In fact, in connection with a different subject or target of this ongoing investigation, you once offered to the agents that you could put all the lockers in the target's real name instead of the alias, correct? A: Yes."). Finally, the government introduced a third set of unsigned contracts dated October 19, 2023, which had been created in response to law enforcement requests. *Id.* at 31; Gov't Exs. 103D, 104C, 105D,

106B, 107C, 108C, 109C, 110C, 111C, 112C, 113C, 114C, 115A, 116B, 117C. Thomas claimed that these contracts were "mistakenly" created by a sales associate (logged into his administrator account) because they were somehow not "able to pull the original lease." Hr'g Tr. Day 1, at 30-31; *see* Gov't Ex. 502.

In addition to rental contracts, the government introduced records from Gotham's elevator security platform, PTI. Both Fernando and Thomas testified that Gotham's leasing software, storEDGE (and formerly Yardi), automatically connects to Gotham's elevator security system, PTI, such that PTI will reflect all of the units leased by a particular individual. Hr'g Tr. Day 1, at 36, 59-60, 65, 134. They explained that to use Gotham's elevators, tenants enter a code (typically their phone number), and whenever a tenant's code was entered, PTI should reflect entries as to all of the units associated with that particular code. *Id.* at 52; 65 (Q: "So whatever units are under her name in storEDGE, in June of 2023 should show up in PTI in June of 2023, correct? A: Correct. Q: And they should show up on every single one of those units, correct? A: Yes, if you're doing a search while they're currently a tenant."); *see also id.* at 139; *see* Def. Ex. HH.[7]

As with the lease agreements, there are multiple sets of PTI records in evidence. *See* Gov't Exs. 401-414; Def. Exs. EEE, FFF. The first set of records was generated in June 2023, when Thomas, at his brother's direction, collected documents in response to a government subpoena. Hr'g Tr. Day 1, at 55-56. However, these records contain ambiguous "user edited" and

---

[7] When confronted with the records that did not show Ms. Sow accessing sixteen units, Thomas and Fernando both speculated as to why that might be. Thomas thought that PTI might not record access to each unit but may instead do a "random selection" of one or some units. *Id.* at 62-63. Fernando thought that when searching PTI records, the system "would pop up all the unit numbers, but it might just show one unit number or it will just say the name." *Id.* at 117. However, he agreed that he previously told the defense's investigator that the PTI system would record access for all units under Ms. Sow's name. *Id.* at 138-139.

"user added" data entries as to Ms. Sow, whereas entries for other individuals show system-generated data, such as which elevator the tenant used. *Compare* Gov't Ex. 411 (showing user-edited data for unit 61442), *with* Def. Ex. FFF, at 164-169 (showing system-generated data for unit 61442). Thomas testified that the "user" in these "user edited" records was a Gotham employee, and for reasons that remain unexplained, Thomas said the "user edited" or "user added" entries appear only for entries in Ms. Sow's name. Hr'g Tr. Day 1, at 58-59, 65, 69.

The government also introduced limited payment records. Thomas and Fernando both testified that Ms. Sow always paid for her own storage units, either in cash or by money order. Hr'g Tr. Day 1, at 33, 115. Yet despite her purported multi-year operation at Gotham—and Fernando's unsubstantiated claim that she was responsible for 80% of the counterfeit shipments at Gotham—the only evidence of payments were twenty-five money orders, most of which were not in Ms. Sow's name or even under any of her purported aliases. *See id.* at 95; Gov't Ex. 701. Thomas testified that the absence of payment records was because Gotham changed banks and did not typically keep payment records (notwithstanding the records actually introduced). Hr'g Tr. Day 1, at 76-77.[8]

## B.  The Expert Testimony

Both parties presented expert witnesses to assist the Court in determining the retail value of the counterfeit goods. The government's expert, Michael Rieger, was a retired NYPD officer now employed as a private investigator by IP House. IP House, as well as Mr. Rieger's prior employer, Allegiance Protection, had been retained by the victim brands to work alongside law enforcement and assist in the prosecution in a variety of ways. Hr'g Tr. Day 2, at 282-88. First,

---

[8] The new, "user friendly" storEDGE system is supposed to hyperlink to payment records and receipts in the billing history tab, but those pages are glaringly empty for Ms. Sow's account. Hr'g Tr. Day 1, at 76.

Mr. Rieger conducted surveillance work in tandem with the government's investigation. *Id.* at 282-83. Second, he was onsite at Gotham during the entirety of law enforcement's warrant execution and seizure operation in October 2023—which took several days—in order to authenticate the goods seized and confirm that they were in fact counterfeit. *See id.* at 270, 286. While he was not at that time inspecting the quality of the goods, Mr. Rieger observed that the items were generally not constructed well and were "by no means high quality." *Id.* at 245. Third, while law enforcement inventoried the goods (counting and classifying the items by brand and type), Mr. Rieger generated for each brand and product type a value range (reflecting a low and high value, as well as a middle or "average" value). *See id.* at 248, 273; Gov't Ex. 1012. He assigned those values based on his experience conducting undercover buys of counterfeits, and he considered a variety of different market settings in crafting his estimates. Hr'g Tr. Day 2, at 249. Mr. Rieger explained that the price range he provided reflected the range associated with "mid-range counterfeit[s]" marketed in a variety of settings (such as on the street, in stores, or online). *Id.* at 249. He acknowledged that he was necessarily imprecise in his estimates, given that each category of product encompassed a variety of sizes and styles. *See id.* at 273-77.

Mr. Rieger testified that the factors affecting the retail value of counterfeit goods included how well a counterfeit product mimics an authentic product, the quality of the construction, and how in-demand a particular style the authentic is. *Id.* at 263, 267-68. At the hearing, Mr. Rieger chose to assign the "average" retail value to all the goods seized, which he acknowledged was lower than the "high" value he had previously recommended (and which had been advanced by the government in its initial sentencing submission). *Id.* at 249-250. While Mr. Rieger was not retained or paid by the government, his time is billed to the victim brands, several of which have

submitted victim impact letters and restitution claims to recover alleged losses associated with the value of the goods, as well as IP House's (and Mr. Rieger's) fees. *Id.* at 237, 243, 286.

The defense called Graham Wetzbarger, who is an appraiser and authenticator in the personal luxury goods field. *Id.* at 299. Mr. Wetzbarger has specialized in authenticating and appraising luxury goods for the past fifteen years. *Id.* He has conducted inspections and authentications—of both counterfeit and authentic goods—for various government agencies, such as the Department of Homeland Security, the Postmaster General, and multiple district attorney's offices. *Id.* at 305. Currently, Mr. Wetzbarger is the founder and CEO of Luxury Appraisals & Authentication, a company which consults with retail, resale, and supply chain businesses, as well as with high-net-worth individuals and estates to authenticate and appraise luxury goods. *Id.* at 298-299; 302-303. Previously, he worked as the head of appraisals & authentication for Bag Borrow or Steal, a luxury accessory rental company; as chief authenticator for the RealReal, a luxury item resale platform; and as the head of authentication and partnerships for TikTok Inc. US, where he launched a $100 million pre-owned category for TikTok Shop US. *Id.* at 299-303. In addition to fifteen years of exposure to counterfeit luxury goods through his work for large companies in authentication and appraisals, Mr. Wetzbarger is also exposed daily to the market for counterfeit luxury goods through inquiries made on his website, Fashion Detective, where consumers can upload images and descriptions of products for authentication and appraisal purposes. *Id.* at 302. Mr. Wetzbarger's work authenticating and appraising goods has often required him to estimate what a counterfeit item "could be sold for if it could legally be sold." *Id.* at 306-307.

In his testimony, Mr. Wetzbarger did not dispute the estimated retail value range assigned by Mr. Rieger for each category of goods. Rather, he took issue with Mr. Rieger's conclusion that

assigning the average of that range was appropriate for the specific goods in this case. Mr. Wetzbarger inspected seventeen sample items that the government agreed were representative of the quality of the goods seized, *see* Def. Ex. DDD (stipulating that goods were representative); Def Exs. B1-R9 (images of the products Mr. Wetzbarger examined), and he explained that the products had a host of defects, including: broken hardware or flimsy hardware that broke when handled; strong chemical smells; misaligned text, printing, and stitching; and typographical errors in labeling. Hr'g Tr. Day 2, at 316-317, 319-321, 328-331. Given that both Mr. Wetzbarger and Mr. Reiger agreed that a central driver of retail value is how well a counterfeit product mirrors the genuine article, Mr. Wetzbarger concluded that based on the extremely poor quality of the specific goods he inspected, the average customer would be unlikely to pay more than the "low" end of the value range assigned by Mr. Rieger. *Id.* at 312, 334.

## IV.

## THE GOVERNMENT FAILED TO ESTABLISH THE SENTENCING ENHANCEMENTS BY A PREPONDERANCE OF THE EVIDENCE

At the hearing, the government took on the burden to establish by a preponderance of the evidence (1) the quantity of counterfeit goods attributable to Ms. Sow, both during the indictment period and prior; (2) that Ms. Sow qualifies for a two-point leadership enhancement under U.S.S.G. § 3B1.1(c); and (3) that the "retail value" of the counterfeit goods attributable to Ms. Sow under U.S.S.G. § 2B1.1 exceeded $9.5 million, based on the retail value of the goods seized and a "historical" estimate of Ms. Sow's alleged counterfeit activities prior to the indictment period. *See United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016) ("The Government bears the burden of proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence." (citing *United States v. Archer*, 671 F.3d 149, 161 (2d

19

Cir. 2011))); *United States v. Fatico*, 458 F. Supp. 388, 403 (E.D.N.Y. 1978) (explaining that preponderance standard "seeks to minimize the probability of error" and requires finder of fact to believe fact is "more probable than not"). "[M]ere speculation" is insufficient to meet this burden. *See United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." (citation omitted)).

Moreover, while hearsay is admissible, the record must establish "guarantees of reliability" for hearsay statements. *See United States v. Fatico*, 579 F.2d 707, 712-13 (2d Cir. 1978) ("[A] significant possibility of misinformation justifies the sentencing court in requiring the Government to verify the information."); *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005) ("[A] defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information. Due process requires that some minimal indicia of reliability accompany a hearsay statement." (citation omitted)).

Here, the evidence introduced by the government was insufficient to prove by the preponderance of the evidence that any of the sentencing enhancements should apply. The two informants' testimony was contradictory and, in some instances, patently false, and Fernando's obvious desire to make money incentivized him to exaggerate Ms. Sow's role. Moreover, the Gotham records, which he and Thomas largely created and produced, are inconclusive and incomplete, and do not permit the conclusion that Ms. Sow had control over the storage units the government now seeks to attribute to her. Finally, there is no sound basis to credit the conclusion of the government's expert that the retail value of the seized goods should be the "average" of the estimated range. Mr. Rieger admitted that he was considering irrelevant markets when crafting his estimate, and the testimony of the defense expert, Graham Wetzbarger, made clear

that the seized goods were of the lowest quality; thus, the low end of the government's estimate should be the basis for calculating "retail value."

A.  **The Court Cannot Credit the Testimony of the Velazquez Brothers**

Much of the government's case hinges on the credibility of Fernando Velazquez, a career informant, who pitched and built this prosecution with the goal of landing a "payday" to help pay for renovations on one of his three homes. Hr'g Tr. Day 1, at 143, 184. It is clear from his prior history, and his communications in connection with this matter, that Fernando knows how to play the game. He understands that as an informant, he has to "play a part" and pretend that he is "cool with whoever [he's] dealing with." *Id.* at 141. Fernando agreed that an informant does not know how much he will be paid at the outset of a case and that at "first [you] have to show them that you have enough value to even get signed up." *Id.* at 142. He also understood that the amount he would ultimately get paid "depends on how useful [he's] going to be." *Id.* at 141. Indeed, his testimony laid bare the lengths to which he went to earn his payout. He first reached out to NYPD in January 2023, and only after several months did he finally secure a meeting with HSI agents who were interested in pursuing the case. *See id.* at 126, 144. Then, it took several more months before they formally signed him up as an informant, during which time Fernando sent hundreds of text messages to various agents in an effort to give them "as much information as possible." *Id.* at 196. Moreover, Fernando was mindful of what law enforcement might need to get a warrant or useful evidence, as he once went so far as to offer to manipulate the storEDGE system so as to "put all the lockers in [a] target's real name instead of the alias." *See, e.g.*, Hr'g Tr. Day 1, at 130. He also deleted all his text messages with or about Ms. Sow, despite knowing how important it was to collect and preserve evidence. *Id.* at 179-180, 191. He repeatedly acknowledged that his number one motive was to get paid, *see, e.g.*, *id.* at 111 (agreeing he reported the counterfeiting activities at Gotham for "money . . . . Confidential informants get

21

paid"), and his hard work paid off. Fernando made more than $12,500 in exchange for his information in this case, *id.* at 118-119, and he estimates that he has, over time, made over $150,000 as an informant, none of which he has reported to the IRS. *Id.* at 140.

Whenever a witness has been paid for his information, a factfinder should examine his or her testimony with "greater scrutiny." 1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions: Criminal, Instruction 7-14 (2019). Indeed, in the probable cause context, courts generally require that a paid informant's statements be backed by "prior reliability or corroboration." *United States v. Harding*, 273 F. Supp. 2d 411, 418-419 (S.D.N.Y. 2003). No such corroboration is present here. In fact, on its face, Fernando's testimony was internally inconsistent, and his demeanor on the stand did not inspire confidence in his trustworthiness. At times, he appeared almost flippant in his willingness to make things up, *i.e.*, claiming the "tall Black man" in the video was Ms. Sow's employee but admitting that he had "never once in any prior meeting in connection with this matter identified this taller black man on the video as a worker for Ms. Sow." *See* Hr'g Tr. Day 1, at 155. And on cross-examination, he often refused to acknowledge small easy truths. For example, Fernando testified that Ms. Dieng had been introduced as "[Ms. Sow's] sister," and on cross examination at first refused to admit that he had told the agents only a few weeks prior to the *Fatico* hearing that he did not actually believe that they were sisters. *See id.* at 122-123 (testifying that he "didn't know if [she] was or wasn't" Ms. Sow's sister). He later acknowledged that he did not believe her to be Ms. Sow's real sister, *id.* at 125 (ultimately agreeing, after having his recollection refreshed, that he had told law enforcement "that [he] didn't really believe that that individual was Ms. Sow's little sister"), but still insisted that she was Ms. Sow's employee, despite months of telling agents that she was an independent operator who was responsible for her own units. *Compare id.* at 122, 201-204, 207-

208; Def. Exs. YY, ZZ, *with* Hr'g Tr. Day 1, at 208 ("Q: The first time that you said that [Ms. Dieng] was a worker for Ms. Sow was in the last couple weeks before this hearing, correct? A: Yes, I believe so.").

While Thomas's testimony did not suffer from the same obvious facial defects, there are nonetheless ample reasons to view his account skeptically. In addition to the close family relationship, as well as Fernando being at least two decades older than Thomas, Fernando helped Thomas obtain his job at Gotham and is his direct supervisor. Hr'g Tr. Day 1, at 7-8. Fernando also brought Thomas into helping him work on this case, taking him to meetings with the agents in the park (which Fernando denied ever happened) and seeking Thomas's help in responding to subpoenas and warrants. *Id.* at 55, 73, 181. Thomas admitted that the brothers discussed the case and discussed Ms. Sow. *Id.* at 80-81. In short, there is good reason to believe that his testimony was heavily influenced by his brother, if not explicitly coordinated with him. Simply put, neither brother was credible, and the Court should discount their testimonies in their entirety.

**B.** **The Two-Level Leadership Enhancement Does Not Apply, and Ms. Sow Should Receive the Zero-Point Offender Reduction**

The Velazquez brothers' credibility problems are particularly acute as they relate to the government's claim that Ms. Sow had an employee, meriting a two-level enhancement under U.S.S.G. § 3B1.1(c) for being "an organizer, leader, manager, or supervisor." U.S.S.G. § 3B1.1(c). "To qualify for an adjustment under § 3B1.1[(c)], the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) (citation omitted); *see United States v. Sampel*, 860 F. App'x 789, 791 (2d Cir. 2021) (same in context of U.S.S.G. § 3B1.1(b)). A defendant's control is critical; the Second Circuit has held the enhancement *cannot* apply where others involved in

the crime are not clearly under the control of the defendant. *See Sampel*, 860 F. App'x at 792 (enhancement did not apply where defendant "told a person pick up money from his wife[, which] does not establish that Sampel "exercised [any] degree of control" over her, or that he in any way directed her involvement in the [offense conduct]" (citation omitted)); *United States v. Burgos*, 324 F.3d 88, 92-93 (2d Cir. 2003) (enhancement did not apply where defendant demanded another participant speed up payments, and finding that "[t]hese communications do not reflect [defendant] exercising control" but rather suggest the other participant's independence); *United States v. McGregor*, 11 F.3d 1139, 1139 (2d Cir. 1993) (enhancement did not apply where defendant "asked his wife to hand over packages to some men . . . while he was away.").

Even though the agents worked closely with Fernando throughout 2023 and 2024—indeed, Fernando had been feeding the agents information on a near daily basis for months and met up with them regularly—the government's estimate of Ms. Sow's guidelines in connection with her March 21, 2024 plea contained no reference to a leadership enhancement, nor did its original sentencing memorandum reference her having any employees. Rather, the government told the Court that it only learned this information while preparing for the *Fatico* hearing. Hr'g Tr. Day 1, at 186.

But this 11th-hour pivot lacks credibility and only underscores Fernando's willingness to exaggerate in order to build what he perceived to be a bigger case. This "Albanian" individual was clearly visible in the undercover buy video recorded by Fernando in October 2023. *See* Gov't Ex. 801. Yet this man does not interact at all with Ms. Sow during the video, and he instead appears to be completing a deal with another individual, accepting a sizable amount of cash—an unlikely task for an underling worker subject to Ms. Sow's control. *Id.*; Hr'g Tr. Day 1,

24

at 153. Moreover, despite this individual's presence on the video, and Fernando's expressed intent to provide the agents with as much information as possible, Hr'g Tr. Day 1, at 196, Fernando does not identify this man as a worker for Ms. Sow in the debrief immediately following the recorded buy. *Id.* at 162. In fact, he does not identify him at all. *Id.* Beyond that, three weeks *before* the undercover buy, Fernando sent the agents a picture of this same individual inspecting a shipment that he identified as relating to an entirely different target, Adrian Peace, and a storage unit *unrelated* to Ms. Sow. *See* Def. Ex. XX-1; Hr'g Tr. Day 1, at 194. While Fernando tried to claim that the man just happened to be in the picture, and perhaps had nothing to do with the shipment, Hr'g Tr. Day 1, at 195-196, his explanations strain credulity and lack common sense, especially as he had previously acknowledged that in sending pictures to the agents, his goal was to "link[] individuals to shipments and to units," *id.* at 165. In any event, Fernando still did not identify this individual as Ms. Sow's worker.[9]

While Thomas also claims that the "Albanian" or "Lebanese" man with white hair was Ms. Sow's employee, his only source for this claim is that this man supposedly "told" him that he worked for Ms. Sow. *Id.* at 17, 78. Thomas did not know the man's name, had never seen or heard Ms. Sow interact with this man, and admitted that he did not know whether this man in fact worked as an agent for the counterfeit goods supplier, rather than for Ms. Sow. *Id.* 78-79. Indeed, given his lack of independent knowledge, Thomas conceded that he did not know whether the man was even telling the truth. *Id.* Not only does the hearsay testimony lack any

---

[9] Also visible in the undercover buy video is a "tall Black man," who Fernando claims was Ms. Sow's employee. *See id.* at 155; Gov't Ex. 801. Yet during his debrief with the agents immediately following the buy, Fernando did not identify the "tall Black man" as Ms. Sow's employee and apparently offered this information for the first time at the *Fatico* hearing. *See* Hr'g Tr. Day 1, at 155 (agreeing that he had "never once in any prior meeting in connection with this matter identified this taller black man on the video as a worker for Ms. Sow").

objective indicia of reliability, Thomas himself appears not to believe it to be reliable. *Martinez*, 413 F.3d at 244 ("[A] defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information. Due process requires that some minimal indicia of reliability accompany a hearsay statement." (citation omitted)).

Fernando's willingness to fabricate testimony to bolster a more serious case against Ms. Sow is rendered obvious upon examining his claim that Ms. Sow also employed Ms. Dieng. According to Fernando's *Fatico* testimony, in the summer of 2023, Ms. Sow supposedly introduced Ms. Dieng as her sister and told Fernando that she was working for Ms. Sow and renting units on her behalf. *Id.* at 103, 155. Yet, he conceded that prior to January 2025, he had repeatedly told agents that Ms. Dieng was working on her own, and in no way connected her to Ms. Sow. *See id.* at 122, 203-204, 207-208; Def. Ex. ZZ (first identifying Ms. Dieng for case agents as a "[n]ew lady," and sharing her name, phone number, address, and unit numbers (which included unit 61132)). For example, even though he supposedly learned Ms. Dieng was renting units and working for Ms. Sow at the outset of Ms. Dieng's rental period—July 2023—he nevertheless identified Ms. Dieng in September as a separate target with her own units on the handwritten list he gave to the agents, clearly demarcating her list of units in a separate box and on a different page from Ms. Sow's alleged units. Def. Ex. YY; Hr'g Tr. Day 1, at 198, 201-203; *id.* at 127 (explaining that when he wrote the list, everyone named on the list had their own counterfeiting operation). He also agreed that the government was justified in referring to unit 61132 as the "[Sokhna] Dieng Unit" (without any reference to Ms. Sow) when it sought a warrant because that was the information he had given them. *Id.* at 207. Finally, everything about how Ms. Dieng rented the unit is inconsistent with any claim that she worked for Ms. Sow or rented the units on her behalf:

- Ms. Dieng rented storage units in her own name (using her own license, phone number, and address)—whereas Fernando claimed that Ms. Sow had supposedly asked Fernando to put all units in her name for tax purposes. *Id.* at 199, 208.

- Ms. Dieng paid for her storage units with her own credit card, whereas Fernando claimed that Ms. Sow only paid using cash or money orders. *Id.* at 200-201.

- Ms. Dieng received packages addressed in her own name, whereas Thomas claimed that Adama received packages addressed to aliases. *Id.* at 15, 200.

The reason why Fernando had never linked Ms. Dieng and Ms. Sow until shortly before the *Fatico* hearing is simple: the claim that she was Ms. Sow's employee is a pure fabrication, likely the product of a misguided effort by Fernando to please the agents in an effort to continue being paid. *Id.* at 212.[10]

In short, the evidence offered by the government to support a two-point enhancement—an enhancement that will also deprive Ms. Sow of the two-point zero-point offender reduction—is not only insufficient to satisfy its burden of proof, but it is also constructed of outright lies and last-minute inventions. Accordingly, the leadership enhancement under U.S.S.G. § 3B1.1(c) does not apply, and Ms. Sow is entitled to the two-point reduction available to zero-point offenders under U.S.S.G. § 4C1.1 (a)(10).

---

[10] The further claim by Fernando that he and others called Ms. Sow "boss lady" is of no moment. Hr'g Tr. Day 1, at 214. He quickly agreed that he "always" used the nickname as a term of endearment for a variety of people—including other investigation targets and the case agents. *Id.* at 214-215. It is clear that Fernando's use of the nickname "boss" should not be given any weight when it comes to evaluating whether Ms. Sow had a supervisory role—both based on his casual and widespread use of the term with so many other people, and also because the application notes to the Guidelines provide that such terms "are not controlling" for the § 3B1.1 analysis. § 3B1.1, App. n. 4; *see United States v. Si Lu Tian*, 339 F.3d 143, 157 (2d Cir. 2003) (noting that "boss" nickname "is not necessarily controlling under the Sentencing Guidelines").

**C.** **Gotham's Records Are Insufficient to Connect Ms. Sow to the 16 Units the Government Seeks to Attribute to Her**

Central to its claim for a 20-point enhancement based on retail value is the government's assertion that Ms. Sow controlled sixteen units containing approximately 85,000 counterfeit items at Gotham. Indeed, at the hearing, Fernando tried to paint Ms. Sow as a big player. According to him, she was responsible for "80 percent" of all incoming shipments at Gotham (out of more than twenty participants) and received upwards of a thousand boxes a week. Hr'g Tr. Day 1, at 95, 171-172, 174-175. However, during the monthslong investigation, Fernando sent the case agents "realtime" (almost daily) updates on the activity at Gotham, including shipments received and which units were affiliated with which target. *Id.* at 174-175. Yet it is unclear how active she really was given that in August 2023, Fernando reported to the agents that Ms. Sow told him that "she is trying to sell all her merchandise to someone else and get out of the game." *See id.* at 176; Def. Ex. SS. When the agents asked if he thought she was serious, he answered in the affirmative. Def. Ex. SS.

To corroborate Fernando's claims as to the scope of Ms. Sow's conduct, the government also offered various lease documents and other Gotham records relating to the sixteen storage units, claiming that they proved that these units belonged to Ms. Sow.[11]  But none of Gotham's records corroborate the Velazquez brothers' exaggerated claims about the scope of Ms. Sow's activities, nor do they cure the fundamental credibility problems with Fernando's testimony.

Of the approximately fifty lease agreements and addenda, only one is signed by Ms. Sow—and Ms. Sow readily admits that she leased that unit to store inventory for her T-shirt

---

[11] The government seeks to attribute to Ms. Sow units 61132, 61368, 61370, 61402, 61430, 61432, 61433, 61434, 61437, 61438, 61440/61441, 61442, 61443, 61459, 61467, and 61471/61472. Gov't Ex. 1012.

business.[12] *See* Gov't Ex. 102A. Indeed, no counterfeit goods were found in that unit, and it is not at issue in this case. The unsigned contracts are relatively meaningless, as both Fernando and Thomas agreed that data, including name and contact information, could be manually changed in both Yardi and storEdge. In fact, Fernando had offered to do so with respect to a different target. Hr'g Tr. Day 1, at 130. Between Fernando's incredible story that he generated many of the contracts so Ms. Sow could file her taxes (despite also testifying that she used aliases to avoid government detection), and Thomas's concession that the contracts dated October 2023 were accidentally generated, there is nothing to assure the Court that the lease documents were in fact created in the ordinary course of business, rather than fabricated or doctored to help build a case against Ms. Sow. In any event, there is no indication that Ms. Sow reviewed or approved any of these unsigned contracts, nor is there any metadata available, despite the fact that most were downloaded from the "user friendly" storEDGE system. *Id.* at 30-31, 110; Hr'g Tr. Day 2, at 235.[13]

More than that, there are oddities in several of the documents, raising additional red flags and suggesting that the contracts may have been manipulated. As to unit 61368, for example, lease documents appear to connect the unit to two different people—Yanick Sow and Thomas Cross—during the same time period. *See* Gov't Ex. 212 (indicating that a "Thomas Cross" rented unit 61368 throughout February 2021); Gov't Ex. 103A-B (indicating that a "Yanick Sow" rented unit 61368 throughout February 2021). Likewise, as to unit 61438, the contract is in the

---

[12] The government's spreadsheet does not reflect that any counterfeit goods were seized from this unit (unit 61288), which makes sense, given that Ms. Sow's use of this unit was for a legal enterprise. *See* Gov't Ex. 1012.

[13] Indeed, Fernando was working with law enforcement as early as January 2023, but it was not until May that he met with federal agents interested in the case, giving him several months to organize the documents and create a paper record. Hr'g Tr. Day 1, at 144.

name of Adrian Peace, yet another investigation target. Gov't Ex. 111A-C; *see* Def. Ex. YY. While Ms. Sow's name is typed onto the unsigned protection plan as of August 2023, that is the exact time that Fernando tells agents that she has told him she is looking to get out of the game. Hr'g Tr. Day 1, at 171. Finally, while there is an unsigned contract in Ms. Sow's name for unit 61459, this unit was not included on either of the handwritten lists Fernando gave to the agents during their investigation, *see* Gov't Ex. 115A; Def. Exs. GG, YY, and none of the elevator access records reflect any activity by Ms. Sow linked to this unit. *See generally* Gov't Exs. 401-414. In fact, elevator access records for unit 61459 show several individuals linked to and accessing the unit from January 2020 to December 2023, none of whom are Ms. Sow. *See* Def. Ex. FFF, at 175-184.

The PTI elevator records only further confuse the issue. Thomas's attempt to run elevator records for Ms. Sow in June 2023 is highly suspect, as these records contain "user added" and "user edited" entries for Ms. Sow, rather than regular activity entries indicating any access of the facility's elevators or points of entry. *See* Gov't Exs. 402-414. As Thomas agreed, such entries could suggest that Gotham personnel input or altered the system's data. Hr'g Tr. Day 1, at 58-59 (agreeing "user" signifies activity by a Gotham employee).

The later-generated PTI records do not contain these "user" generated entries for Ms. Sow. *See* Def. Exs. EEE, FFF. Yet according to Thomas and Fernando, PTI links directly with the data available in the storEDGE system (and it pulled the same information from Yardi), such that all of a tenant's units in storEDGE should be reflected in PTI. Thomas and Fernando both initially agreed that if a tenant had multiple units in storEDGE, whenever the tenant used the elevator, PTI should record access to all of a tenant's units. Hr'g Tr. Day 1, at 52 (agreeing he "told [the defense investigator] that [PTI] would show all the units she had"). And if you have

more than one unit and you enter your code, it's going to show up as you accessing all those units, correct? A: Yes. It would just show your name. Q: But for every single unit that you're the owner of in the storEDGE system, correct? A: Correct."); *id.* at 139 (agreeing he "told [the defense investigator] that [PTI] would show all the units she had"). When trying to explain why the PTI records failed to show Ms. Sow accessing all of the units they claimed were hers, Thomas and Fernando tried to back out of their initial understanding and could not give a coherent explanation. Thomas speculated that the PTI records might "random[ly] select[]" a unit or units to record as accessed, *id.* at 62, or that it would show all the units if you ran the search while they were a tenant, *id.* at 65. Fernando claimed that PTI could "pop up all the unit numbers," or "it might just show one unit number." *Id.* at 117, 139; Def. Ex. HH, at 1:18-1:45.[14]

In short, the documents are a mess. They are incoherent and inconsistent, and, especially in light of the witnesses' credibility problems, are not a sufficient basis to sustain the government's burden of proof. The government is trying to attribute 85,000 counterfeit items to Ms. Sow. It cannot do so on the basis of unsigned contracts lacking metadata and supported only by the uncorroborated and incredible testimony of two paid informants.

**D. The Government Cannot Sustain Its Burden of Proving the Retail Value of the Counterfeit Goods**

To calculate the Guidelines under U.S.S.G § 2B5.3, the Court must estimate the "retail value" of the counterfeit goods, which the Application Notes define as "the retail price of that item in the market in which it is sold."[15] U.S.S.G. § 2B5.3, App. n. 2(C). As with any sentencing guidelines enhancement, it is the government's burden to prove the retail value, which cross

---

[14] In the audio clip, the investigator asks: "Does the system show that all units would be accessed . . . ," and Fernando answers "Like if Sow had fifteen units, every time she put in her number in the [system] then it would show all the units she had." Def. Ex. HH.

[15] The parties agree that Application Note 2(B) and (C) apply for purposes of determining the "infringement amount" under 2B5.3. *See* Hr'g Tr. Day 1, at 188.

references the loss table in § 2B1.1, by a preponderance of the evidence. "In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." *Coppola*, 671 F.3d at 249 (citation omitted).

Here, Mr. Rieger and Mr. Wetzbarger both agreed as to the factors relevant to determining the price of a counterfeit item, which include the quality of the product's construction (which in turn includes the quality of materials, craftsmanship, visible defects, and smell), how popular the brand and style that the counterfeit product copies are, and how well a counterfeit product mimics a genuine one. Mr. Rieger prepared a spreadsheet and assigned a low, average, and high value to each of the style and brand categories inventoried by law enforcement. While Mr. Rieger testified that the goods could be sold for the "average" or mid-point values on the spreadsheet, Mr. Wetzbarger, who did not generally take issue with the retail value ranges assigned by Mr. Rieger, testified that the goods could be sold at most for the "low" values on Mr. Rieger's spreadsheet. *See* Gov't Ex. 1012.

However, there is not a sufficient basis to conclude that assigning the mid-point of the value range ("the average") is reasonable as to the facts of this case. First, Mr. Rieger's value estimates incorporate the price at which the counterfeits would sell in a variety of different counterfeit markets, such as counterfeiting operations run in hair salons, store fronts, and online. Hr'g Tr. Day 2, at 250-251, 271. Here, the weight of the evidence elicited at the *Fatico* hearing made clear that the bulk of the goods were being sold by street peddlers, *see* Hr'g Tr. Day 1, at 127 (agreeing that "a fair bit of . . . these goods ended up on Canal Street"), and both experts agreed that counterfeit goods sold on the street, *i.e.*, Canal Street, sell for lower prices than those in other forums. *Id.* at 268, 318. As such, Mr. Rieger's "average" price point improperly incorporates potential sales in different, pricier markets, and fails to focus on the appropriate

32

market in this case, the street market. *See id.* at 271-272 (agreeing his price ranges account for "a number of settings" and goods could be worth less if sold on the street).

Second, despite agreeing that the "quality of construction" and how closely the counterfeit mimics the original are important factors affecting price, there is no evidence that Mr. Rieger conducted a careful inspection of the quality of the counterfeit goods seized. Other than noting that many of the items were "new" and "in packaging"—which is irrelevant given that there is no secondary market for counterfeit goods, *id.* at 272—Mr. Rieger agreed that these counterfeit goods were "by no means high quality." *Id.* at 245, 270.

On the other hand, Mr. Wetzbarger did carefully inspect the goods, and his review made clear that these particular items were of the lowest possible quality and thus unlikely to even sell for the "low" end of the range assigned by Mr. Rieger. *Id.* at 313, 334. His opinion reflects that some of the goods would be priced below that value. Specifically, he noted that "some items [were] just very laughable" given how cheaply made they were—several items broke as soon as he handled them, rendering them worthless. *Id.* at 335. He consistently observed obvious defects with the products' stitching, text alignment and printing, and hardware. For example, the Gucci handbag he inspected would likely have sold for $25 on the street, but that was before it broke in his hand during the inspection (dropping its value to $0).[16] *See id.* at 316-19; Def. Ex. B1-B9.

---

[16] Mr. Rieger estimated the low price of a counterfeit Gucci handbag as $40. Gov't Ex. 1012.



Similarly, he concluded that the Marc Jacobs handbag would likely only fetch $20 on the street given the "totally []skewed" print on the front of the bag.[17] Hr'g Tr. Day 2, at 319-24; Def. Ex. D1-D8.

---

[17] Mr. Rieger estimated the low price of a counterfeit Marc Jacobs handbag as $50. Gov't Ex. 1012.



Indeed, about two-thirds of the goods Mr. Wetzbarger inspected fit into this "below-low" category and one-third of the goods he inspected could sell at or slightly above the low value, Hr'g Tr. Day 2, at 327-28. Mr. Wetzbarger testified that products in this category were equally poor quality as the "below-low" products, but they were likely to fetch slightly higher prices given the strong market demand for counterfeits in those particular styles. This included the Christian Dior handbag. *See id.* at 325-327 (explaining that, due to the popularity of the style, this bag was likely to sell for the $45 "low" value estimated by Mr. Rieger); Def. Ex. F1-F11.

But perhaps the best evidence of the "low" retail value of these particular items came from Ms. Sow herself. During the undercover buy, Fernando asked Ms. Sow how much she would charge him for a counterfeit Louis Vuitton backpack, which on Mr. Rieger's spreadsheet ranges from $45 to $220 in price, with an average of $132.50. Gov't Ex. 1012. Ms. Sow at first offers to give it to him for free, but when he makes clear that he is going to try to sell it himself, and add $20 to whatever price she charged, she tells him she would charge him $30 (meaning she thinks he could sell it on the street for $50). Hr'g Tr. Day 1, at 159-60; Gov't Ex. 801.

Notably, on Mr. Rieger's chart, the *low* value of a Louis Vuitton Backpack is $45, Gov't Ex. 1012, and Mr. Wetzbarger opined that negotiations for the counterfeit Louis Vuitton backpack he inspected would likely start around $45, Hr'g Tr. Day 2, at 332-33. Given that Ms. Sow priced the backpack at $50, the only data in the record about what Ms. Sow actually sold the bags for aligns with Mr. Wertzbarger's opinion, not Mr. Rieger's, and makes crystal clear just how vastly overstated Mr. Rieger's "average" or mid-point estimates are.

In short, there is insufficient evidence to support a finding that the retail value of these particular goods was the average of the range assigned by Mr. Rieger. What little explanation he gave for assigning the average is undermined by the fact that he had previously assigned the high point of the range. Those seemingly random designations of value can perhaps be explained by the fact that Mr. Rieger is not a neutral expert, but in fact works for the victim brands in this case and was an integral part of the government's investigation team. Paid by the victim brands since the summer of 2023, he kept his clients apprised of the "who, what, where, when, why and basically what was found at the location, kept them updated as to what was going on with their brands." *Id.* at 288. Indeed, most of Mr. Rieger's clients have submitted victim impact letters seeking restitution for their claimed lost sales and reimbursement for Mr. Rieger's fees. *See id.* at 288-289. While he may not be deliberately inflating the value of the goods seized in this case, his clients represent roughly $6.5 million out of the total $7.5 million in losses he calculated for this case, indicating that he has a strong institutional bias to reach a conclusion in favor of his employers' clients. *See id.* at 297; *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (explaining that an expert witness's bias goes to the weight of the testimony). Indeed, given his close involvement with the prosecution team, his testimony should be disregarded by the Court.

In contrast, the close inspection of the goods performed by Mr. Wetzbarger, as well as the price negotiated by Fernando with Ms. Sow during the undercover buy, makes clear that the low values on the government's spreadsheet are the only reasonable values to consider in calculating the retail value of the counterfeit goods in this case.

## E.   **There Is No Basis for Further Enhancing Ms. Sow's Guidelines Through a Historical Projection**

The government also seeks to inflate the loss calculation by an additional $3-$4 million (making the total loss amount approximately $10 million), based on Ms. Sow's purported "historical" trafficking activity.

To date, the government has not clearly disclosed its methodology for computing the $3 million figure, but its prehearing disclosure suggests that it expects to rely on Ms. Sow's "yearslong use of certain" storage units, her "weekly receipt" of a high volume of deliveries at Gotham, and Ms. Sow's bank records. ECF No. 42, at 5. None of these markers are sufficient to extrapolate the loss calculation here. "To sustain quantity-based enhancements . . . the court must base its findings on 'specific evidence' that the offense involved the requisite quantity of items." *Archer*, 671 F.3d at 162; *see United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (*Shonubi I*) (citations omitted) ("Case law uniformly requires specific evidence" for extrapolated quantities to be considered). "Specific evidence" means "specific evidence of what [the defendant] had done," *United States v. Shonubi*, 103 F.3d 1085, 1090 (2d Cir. 1997) (*Shonubi II*), and it requires both that: "(a) there must be evidence regarding the quantity of illicit or fraudulent goods and (b) it has to be specific to the defendant," *Archer*, 671 F.3d at 162; *Shonubi I*, 998 F.2d at 89 (providing that specific evidence means, in context of drug quantities, "drug records, admissions or live testimony-to calculate drug quantities for sentencing purposes"). Speculation is insufficient to establish specific evidence of quantity. *United States v. Pauling*, 924 F.3d 649, 657

(2d Cir. 2019) ("[W]hile quantities of controlled substances . . . may be determined through extrapolation, approximation, or deduction, there ordinarily must be evidence of known quantities, which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be derived.").

The record contains no reliable specific evidence on this issue, and the government has not proved by the preponderance of the evidence the quantity of counterfeit goods historically trafficked by Ms. Sow. Putting aside their fundamental credibility problems, Thomas and Fernando testified inconsistently about Ms. Sow's historical conduct and did not provide any basis for clearly pinpointing the quantity of goods. Thomas testified that Ms. Sow received "at least 100" boxes of counterfeit goods per week, but "sometimes" more. Hr'g Tr. Day 1, at 15; *Pauling,* 924 F.3d at 660 (reference to "nice amount" of drugs was insufficient to support historical extrapolation). In contrast, Fernando testified that Ms. Sow received "[a]bout 800 to 1,000" boxes per week. Hr'g Tr. Day 1, at 95.[18] A range of 100 to 1,000 boxes is not a workable estimate of Ms. Sow's trafficking conduct, and it is equally unworkable to try to extrapolate anywhere from 100 to 1,000 historically. The government has thus not presented sufficient specific evidence of "quantities . . . from which an approximation of the unknown quantities can logically be derived." *Pauling,* 924, F.3d at 657; *see United States v. Sarcia*, No. No. 3:19-cr-64, 2022 WL 17546758, at *5 (D. Conn. Dec. 9, 2022) (observing that because the evidence was insufficient to determine a threshold quantity, "the Court could not then extrapolate or approximate the unknown quantities").

---

[18] This estimate is not credible given that when Fernando was providing real-time updates on the investigation targets, he rarely reported on shipments to Ms. Sow, and certainly not on a scale that would support claiming she received upwards of 1,000 boxes per week.

Compounding the lack of specific evidence, the available evidence is contradictory when it comes to Ms. Sow's pre-2023 conduct. Thomas testified that the number of storage units used by Ms. Sow "would always fluctuate" "depending on how her business was going." Hr'g Tr. Day 1, at 13-14. He also testified that there was no change in her operation during the Covid-19 Pandemic. *Id.* at 12. Fernando testified inconsistently on this topic, both claiming her business did not take a hit during the Pandemic, but also agreeing that he gave her "hardship" discounts on rent due to business being slow. *Id.* at 175-76. This conflicting testimony does not provide any reliable evidence that Ms. Sow's business operated at a steady level such that a particular amount of historical trafficking could reasonably be estimated.

Moreover, there are no clear records linking Ms. Sow to particular storage units for much of the pre-2023 time period. For example, there are no lease agreements or other unit-related documents under either Ms. Sow's name or any of her purported aliases. Also, the elevator access records show usage by Ms. Sow from July 30, 2020 to October 6, 2020, but then there are *no* further system-generated entries for Ms. Sow until 2023. Def. Ex. FFF, at USAO_0005320, 5328; Gov't Ex. 405, at USAO_0000447.[19]

Ms. Sow's bank records likewise do not support the government's position. While the TD Bank records do reflect a large in-flows and out-flows, including large wire transfers to China, the government has not offered any evidence to connect these transactions to illicit activity. Nor could it, given that many of the transactions are obviously irrelevant to this hearing. For example, Ms. Sow received rental income totaling approximately $22,800 during the period

---

[19] The elevator access records contain "user" generated data for Ms. Sow beginning in April 2023. *See* Gov't Ex. 403, 405-408, 410-414. As explained above, those entries were likely created by someone at Gotham, not by the PTI system, so they should be given no weight.

identified by the government. *See* Gov't Ex. 1003, 1004, 1011. Similarly, approximately $124,000 is a transfer Ms. Sow made to herself from one of her other bank accounts. Gov't Ex. 1004. Furthermore, given the flimsy evidence relating to her pre-2023 activity, it would be unreasonable to simply assume that these transactions are related to trafficking.

Simply put, any historical extrapolation based on the existing evidence would not be reasonable or reliably accurate, as required by the governing law.

## F. The Appropriate Advisory Guidelines Range is 18 to 24 Months

Only the goods from storage units 61432 and 61441 can be fairly attributed to Ms. Sow, as these are the showroom units where Fernando buys counterfeit items from her on the undercover videos.[20] Using the government's spreadsheets and inventory documents tallying the number of goods recovered from each unit, the aggregate "low" value for the goods from those two units is $446,600, which correlates to the following Guidelines calculation:

- Base offense level of 8, pursuant to U.S.S.G. § 2B5.3(a).

- Increase of 12 levels from the loss table (based on retail value of $446,600) pursuant to U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1.

- Reduction of 3 levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.

- Reduction of 2 levels for Ms. Sow's status as a zero-point offender, pursuant to U.S.S.G. § 4C1.1.

---

[20] By conceding her connection to these units, Ms. Sow does not concede that she had sole control over the unit or that all of the items in those units were hers.

This calculation results in an adjusted offense level of 15. Because Ms. Sow is in Criminal History Category I, *see* PSR ¶ 33, her advisory Guidelines range is 18 to 24 months.[21]

## V.

### THE COURT SHOULD SENTENCE MS. SOW TO TIME SERVED

District courts have an "overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). While the Guidelines are the "starting point and the initial benchmark," the court "may *not* presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (emphasis added). Rather, the sentencing court must make an "individualized assessment" of the sentence warranted by 18 U.S.C. § 3553(a) "based on the facts presented." *Id*. at 50. The Supreme Court has "emphasized that highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 488 (emphasis added) (citations, alterations and quotation marks omitted). "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation omitted). The Court must also consider all "the kinds of sentences available," including those "other than imprisonment." *Gall*, 552 U.S. at 59 (citing 18 U.S.C. §

---

[21] Even if the Court were to attribute to Ms. Sow *all* counterfeit goods from each of the 16 units, which it should not, the total "low" end loss amount would correspond to a 16-point enhancement pursuant to U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1, resulting in an adjusted offense level 19 and a 30 to 37 months' Guidelines range.

41

3553(a)(3)). Finally, in fashioning a sentence, 18 U.S.C. § 3582 instructs that courts may not consider imprisonment as "an appropriate means of promoting correction and rehabilitation."

Here, there is no doubt that Ms. Sow carries enormous pain. ███████████████████ ██████████████████████████████████████████████████████████████ to escape her situation and build a better life, not just for herself, but for her young sisters whom she brought to this country and raised on her own. While the extent of Ms. Sow's prior suffering is no excuse for criminal conduct, it does contextualize it and mitigate her culpability for what is essentially an economic and regulatory offense. Indeed, her past traumas compromised her decision-making skills and inform her deep-seated need to ensure that her family is secure and safe, physically and emotionally. Given these circumstances, and Ms. Sow's need for sustained and real mental health treatment, a custodial sentence would risk undermining, rather than advancing, the public interest. Moreover, any term of incarceration would wreak havoc on her close-knit family. Ms. Sow is the matriarch by default, and she has taken on the important role of caring for her two-year-old niece since her arrest. Finally, neither general deterrence nor the need to promote respect for the law requires sending Ms. Sow to jail, and the high Guidelines range advanced by the government overstates the seriousness of Ms. Sow's offense. Indeed, Congress contemplated that non-custodial sentences are generally appropriate for first-time offenders convicted of non-violent offenses, and the Court should impose a non-custodial sentence here.

**A.  Ms. Sow's Trauma History Warrants Leniency and Counsels Against Incarceration**

It is beyond question that childhood abuse, along with its continuing psychological ramifications, warrants leniency at sentencing. *See, e.g., United States v. Sawyer*, 672 F. App'x 63, 67 (2d Cir. 2016) (summary order) (remanding sentence as substantively unreasonable where sentencing court failed to appropriately weigh the defendant's history and characteristics given "the exceptional horrors of [defendant's] childhood" and over-relied on potential danger to the

community); *United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005) (noting, in mandatory Guidelines case, that "a downward departure may be warranted on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense" (quotation marks and citations omitted)); *United State v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions" and finding downward departure appropriate in cases of extreme childhood abuse).

43

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

Ms. Sow's mental health conditions are also relevant for sentencing because it is clear that "incarceration itself will exacerbate the symptoms of [Ms. Sow's] untreated trauma, as well as re-traumatize and inflict new traumas." *Id.* at 20. Not only is jail incredibly stressful and traumatic in its own right, but the BOP in particular is ill-equipped to provide her with the needed mental health treatment. As has been widely reported, the BOP's health service units are grossly understaffed and woefully inadequate. *See* Christie Thompson & Taylor Elizabeth

Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21, 2018), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-infederal-prisons; U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* at 1 (2016), https://oig.justice.gov/reports/2016/e1602.pdf (describing medical staffing rate in certain BOP facilities "as crisis level"); Christine Sarteschi, *Mentally Ill Offenders Involved with the U.S. Criminal Justice System*, SAGE Open (July-September 2013)*,* https://journals.sagepub.com/doi/epdf/10.1177/2158244013497029 (only 24% percent of inmates in federal correctional facilities received any form of mental health treatment). Recent reports have identified severe shortcomings specifically with BOP's mental health programming, including a 2024 report from the DOJ Inspector General's office, which found "recurring policy violations and operational failures contributed to inmate suicides," "inappropriate Mental Health Care Level assignments," "staffing shortages," "outdated security camera system[s]," "staff failure to follow BOP policies and procedures," and "an ineffective, untimely staff disciplinary process." Department of Justice Office of the Inspector General, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, i-ii (February 2024), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://oig.justice.gov /sites/default/files/reports/24-041.pdf; *see also* Sarteschi, *Mentally Ill Offenders Involved with the U.S. Criminal Justice System*, *supra*, at 6.

██████████████████████████████████

██████████████████████████████████ One U.S.

Senate report found that BOP employees sexually abused women prisoners in at least two-thirds of federal prisons housing women in the last decade. United States Senate, *Sexual Abuse of Female Inmates in Federal Prisons*, 1 (2022), https://www.hsgac.senate.gov/wp-

content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.    The Second Circuit has recognized that lenience is warranted for vulnerable individuals— including survivors of sexual assault or those with mental health conditions—as "they may experience particularly oppressive conditions in prison, and that this bears on the propriety of the sentence imposed." *United States v. D.W.*, 198 F. Supp. 3d 18, 136 (E.D.N.Y. 2016) (*citing United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir. 1991)). "As acknowledged by the BOP, several factors render an inmate especially susceptible to abuse while in prison . . . [t]hey include being perceived as gay, having been a victim of sexual abuse in the past, [and] suffering from mental illness[.]" *Id.* at 66. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

　　　████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

In short, imprisoning Ms. Sow now would be counterproductive for Ms. Sow, and, in turn, for the public interest. Community-based mental health treatment is what Ms. Sow needs to improve her decision-making skills and develop healthy coping mechanisms, the tools Ms. Sow needs to prevent recidivism.

**B. <u>The Court Should Consider Ms. Sow's History of Good Deeds and that Any Term of Imprisonment Would Impose Undue Hardship on her Family.</u>**

As the letters written to the Court make clear, Ms. Sow is a generous, selfless person who prioritizes the well-being of her family over herself, in spite of the undeniably horrific abuse and neglect Ms. Sow suffered during her childhood and teenage years. While good deeds do not negate bad ones, "weighing the good with the bad" was "plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (quoting 18 U.S.C. § 3553(a)(1)). Here, Ms. Sow's entire life has been devoted to protecting and nurturing her sisters and their children, and as they explain in their letters to the Court, they wholly credit Ms. Sow for each of their successes in life. *See e.g.*, Ex. C-1, Ltr. from Kadiatou Sow ("[Ms. Sow] was crucial to my upbringing and now she is invaluable to my toddler's as well . . . . "); Ex. C-2, Ltr. from Safiatou Sow ("[Ms. Sow] devoted herself to helping us instead of pursuing an education herself."). Her niece Djenabou writes what all in her family recognize, namely, that Ms. Sow always thinks of others before herself: "My aunt Adama has selflessly made sacrifices everyday just to make sure we had food on the table and for everyone else's goals and dreams." Ex. C-3, Ltr. from Djenabou Diallo. Ms. Sow's exemplary efforts to care for her family—and her instrumental role in helping them thrive as successful adults in society now—mitigate her culpability and warrant the Court's compassion.

Indeed, Ms. Sow's family members—particularly her sister Kadiatou and Kadiatou's two-year-old daughter—will suffer if she is incarcerated, yet a further basis for leniency. *See e.g.*, *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure for defendant who, among other things, cared for ailing elderly father because "close-knit family['s] . . . stability depend[ed] on [defendant's] continued presence"); *United States v. Seemongal*, No.

10-cr-70, 2012 WL 4049594 (E.D.N.Y. Jan. 10, 2010) (imposing sentence of time served where "incarceration would prove ruinous for defendant and her children," the conduct that led to the instant prosecution "appear[ed] to be aberrant," restitution had been ordered, and it was "unlikely that the defendant [would] engage in further criminal activity in light of her family ties and her regret for her past misdeed"). Since her arrest, Ms. Sow has taken on the critical role of providing childcare to her two-year-old niece, Kadiatou's daughter, multiple days a week and when Kadiatou works night shifts. Ex. C-1, Ltr. from Kadiatou Sow. Ms. Sow coordinates taking her niece to various activities and appointments, and is helping her learn both their native language, Fulani, as well as English. Kadiatou depends heavily on Ms. Sow so she can keep her job and advance her career, and she feels that Ms. Sow is "irreplaceable" in her daughter's life. *Id.* Indicative of their exceptionally close relationship, Ms. Sow's niece calls Ms. Sow "grandma." *Id.* Should Ms. Sow be incarcerated, the effect on her family would be devastating.

## C. **The Guidelines Range Advanced by the Government is Greater Than Necessary to Reflect the Seriousness of the Offense and Promote General Deterrence**

It is also important to emphasize that the Guidelines calculation advanced by the government severely overstates the gravity of Ms. Sow's offense. Counterfeiting is, as the government has previously noted, a global business. ECF No. 25, at 6 ("[C]ounterfeiting is the 'largest criminal enterprise in the world,' eclipsing even the illegal drug trade." (citation omitted)). But the most significant contributors to that marketplace are not individual operators supplying street peddlers on Canal Street, but the online marketplaces that turn a blind eye to the illegal multi-million-dollar business. *See* Danny Parisi, *"It's Not Doing Enough": Amazon's Counterfeit's Business Is a Deal Breaker for Luxury Brands*, GLOSSY (Jan. 30, 2020), https://www.glossy.co/fashion/its-not-doing-enough-amazons-counterfeits-business-is-a-deal-breaker-for-luxury-brands/; Jay Greene, *How Amazon's Quest for More, Cheaper Products Has*

*Resulted in a Flea Market of Fakes*, Wash. Post (Nov. 14, 2019), https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true. Put differently, Ms. Sow is a very minor player in this world and punishing her with a severe jail sentence would not put a dent in the active and lucrative market for fakes.

Moreover, as prior counsel noted, the Sentencing Commission's rationale for equating the sale of counterfeit goods to theft and fraud is that "intellectual property offenses should reflect the nature and magnitude of the pecuniary harm caused by their crimes." *See* 2B5.3, Background; ECF No. 26 at 6. Yet here there are several reasons why using that infringement amount—especially the one advanced by the government—vastly overstates Ms. Sow's culpability. First, there is no indication that whatever inventory the Court attributes to Ms. Sow in fact correlated with actual sales. Nor is there any indication that any consumer was in fact deceived into buying one of her counterfeit items or would otherwise have purchased the genuine item, such that the brands lost actual revenue or incurred any "pecuniary harm." Just the opposite: 2023 was a banner year for the luxury brands, which saw record-breaking profits during the time period charged in the indictment. *See* LVMH, *2023: New Record Year for LVMH* (2024), https://www.lvmh.com/en/publications/2023-new-record-year-for-lvmh (reporting revenue of €86.2 billion ($93 billion) in 2023, and noting that brands such as Louis Vuitton and Mark Jacobs achieved record levels of revenue and profits). As such, their true "losses" from Ms. Sow's conduct, if any at all, are not readily calculable. U.S.S.G. § 2B1.1 App. n.3(iii) (defining "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.").

Also, the nature and magnitude of the harm caused by many thefts and fraud are categorically different from Ms. Sow's conduct. She did not deceive people into parting with their money, and she did not set out to hurt anyone. To be sure, Ms. Sow's conduct diluted the brands' integrity and caused harm to their reputations, but it is meaningless to quantify that harm in monetary terms, as Ms. Sow's fraud is simply not the equivalent of a $3 million or $10 million embezzlement or theft. To put it in perspective, the government's Guidelines range is the same or higher than the offense levels for obviously more serious crimes, such as attempted murder, U.S.S.G. § 2A2.1, robbery where a firearm was discharged or the loss exceeds $9.5 million, *id.* § 2B3.1, keeping a person in involuntary servitude for more than a year, *id.* § 2H4.1, or the large-scale trafficking of firearms, *id.* § 2K2.1. These crimes involving firearms, intent to murder and slavery, are in no way commensurate with Ms. Sow's crime, which was not intended to, and did not in fact, injure anyone.

Finally, a term of imprisonment is not needed to deter others from committing similar crimes. As the National Institute of Justice reports, the certainty of punishment is "a vastly more powerful deterrent than the punishment," and "[i]ncreasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, *National Institute of Justice: Five Things About Deterrence* (2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. Rather, the government's press releases and news coverage regarding this case meet the goals of general deterrence. *See, e.g.*, https://www.justice.gov/usao-sdny/pr/largest-ever-counterfeit-goods-seizures-result-trafficking-charges-against-two; *United States v. Danilow Patry Co., Inc.*, 563 F. Supp. 1159, 1167 (S.D.N.Y. 1983) ("[D]eterrence is fostered by the publicity garnered by the sentences.").

**D.  A Guidelines Range Recommending a Custodial Sentence is in Conflict with 28 U.S.C. § 994(j), which Directs the Court to Impose a Sentence Other than Imprisonment**

It is also relevant that the high guidelines range advanced by the government is in direct tension with Congress's intent when establishing the sentencing guidelines. Specifically, Section 994(j) of the Sentencing Reform Act (SRA) requires that:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j).

The plain text of § 994(j) unambiguously instructs the Commission to implement a default rule that first-time offenders should not be imprisoned, except for in the narrow circumstances that they were convicted of a violent crime or equally serious offense. Here, Ms. Sow is a first-time offender, and the offense of conviction, trafficking in counterfeit goods, is clearly neither a crime of violence nor an "otherwise serious offense," and any Guidelines range that recommends a custodial sentence deviates from Congressional intent and should be rejected.

As explained by the Supreme Court in *United States v. LaBonte,* the Sentencing Commission's discretion "must bow to the specific directives of Congress" and "[i]f the Commission's revised commentary is at odds with [the statute's] plain language, it must give way." *See* 520 U.S. 751, 757 (1997) (rejecting the Commission's interpretation of the career offender guideline, determining that it contradicted Section 994(h)'s plain meaning that the Guidelines specify a term of imprisonment at or near the "maximum term authorized" for career offenders) (internal citations and quotation marks omitted; emphasis added). In the years since *LaBonte,* courts consistently deferred to the Sentencing Commission's interpretation of the Sentencing Reform Act (either under *Chevron* deference or otherwise). Now, in light of the

Supreme Court's groundbreaking decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruling the *Chevron* doctrine, it is clear that courts should not assume that such interpretive authority has been delegated to the Sentencing Commission. Rather, *Loper Bright* teaches that courts are in the best position to resolve statutory ambiguities, rather than the agency. *Id.* at 395, 399-400.

And here, as a matter of straightforward statutory interpretation, the instant offense is not an "otherwise serious offense." The term "otherwise serious offense" must be interpreted based on its context in the statute. *Yates v. United States*, 574 U.S. 528, 543 (2015) (observing that "[t]he words immediately surrounding a phrase "cabin the contextual meaning"). Here, "an otherwise serious offense" immediately follows the far more specific "crime of violence" language, suggesting that "an otherwise serious offense" must be of equal seriousness to "crimes of violence." *See Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 76 (2d Cir. 2022) ("*Ejusdem generis* refers to the understanding that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (alterations omitted)). Of course, crimes of violence are necessarily serious because they involve the threatened or intended use of physical force or a substantial risk thereof. *See* 18 U.S.C. § 16 (defining as both (1) "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," and (2) "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); *id.* § 924(c)(3) (providing similar definition).

In comparison, trafficking in counterfeit goods is not equally serious to a crime of violence. It has a statutory maximum of ten years, 18 U.S.C. § 2320(b)(1)(a), and is a Class C felony, *id.* § 3559(a)(3). As noted *infra*, measuring whether there is any actual harm from counterfeit trafficking, especially with respect to cheap, poorly made knock-offs, is nearly impossible. *See* U.S. Gov't Accountability Office, *Intellectual Property: Observations on Efforts to Quantify the Economic Effects of Counterfeit and Pirated Goods*, at 17-18 (Apr. 2010), https://www.gao.gov/products/gao-10-423 (describing the difficulty in quantifying loss caused by counterfeit goods, noting, among other factors, the substitution rate, meaning the rate at which a consumer is willing to switch from purchasing a fake good to the genuine product, and the level of deception the consumer faced when purchasing the counterfeit good).[22]

Accordingly, because Ms. Sow is a first offender, has not been charged with a crime of violence, and "an otherwise serious offense" does not encompass the instant offense conduct, the Commission exceeded its authority under Section 944(j) in promulgating Guidelines and application notes recommending a term of incarceration for the instant offense. The Court should instead follow the clear directive of Congress and impose a non-custodial sentence.

This is particularly true given that Ms. Sow presents an extraordinarily low risk of recidivism based on her personal history and potential for rehabilitation. Indeed, courts routinely consider factors such as a defendant's lack of criminal history, age, and strong family support system as clear markers that a defendant is unlikely to recidivate. *See United States v. Fernandez*, No. 12-cr-844, 2015 WL 1542026, at *4 (S.D.N.Y. Apr. 6, 2015) (imposing below-Guidelines

---

[22] To the extent the Court finds the term "otherwise serious offense" to be ambiguous, it is the Court's responsibility—not the Commission's—to determine whether trafficking in counterfeit goods constitutes an "otherwise serious offense." *See Loper Bright Enters.*, 603 U.S. at 413.

sentence where "Defendant has no history of criminal activity and the instant offense constitutes both his first arrest and first conviction"); *United States v. Collado*, No. 01-cr-1103-02, 2006 WL 2872593, at *3 (S.D.N.Y. Oct. 10, 2006) (imposing sentence of probation where defendant "has no prior criminal convictions and appears to have otherwise been law-abiding"); *United States v. Hernandez*, No. 1:03-cr-01257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (defendants who are over 40 years old "exhibit markedly lower rates of recidivism in comparison to younger defendants" (citation omitted)); *United States v. Cosme*, No. 06-cr-608, 2010 WL 276599, at *2 (E.D.N.Y. Jan. 19, 2010) ("Specific deterrence is satisfied because it is improbable that [defendant] will engage in further criminal activity in light of his lack of any prior criminal history, acceptance of responsibility, . . . and supportive family members.").

Here, as the Probation Department recognized, each of those factors weighs in Ms. Sow's favor. *See* PSR Addendum at 27 (observing that Ms. Sow is not a danger to the community); PSR at ¶ 85 (noting her "lack of criminal history and familial ties"). The instant offense is Ms. Sow's only instance of illegal conduct, and she deeply regrets her involvement in the counterfeiting operation. She has struggled with "periods of depression and anxiety," internalized her shame, and learned a profound lesson from this experience. *See* Ex. B, Ltr. from Adama Sow. In her updated letter to the Court, she writes that while she "struggles to forgive herself," she is "glad that these events have transpired because [she] can now focus on the right things." *See id*. She is now 40 years old, and has an exceptional support system in her sisters, nieces, and friends, who are each eager to help her move on from this stage in her life. *See* Ex. C-1 to 4. Ms. Sow will need their help. Her sister Safiatou is concerned that ever since her arrest, Ms. Sow has "not been the same," and "carries too much emotional weight," and she is committed to helping Ms. Sow find the "courage" to get mental health treatment. *Id.* Ex. C-2, Ltr. from Safiatou Sow. Given that

Ms. Sow's family stands ready to help Ms. Sow "prove [her] genuine commitment to this new chapter in [her] life," Ex. B, Ltr. from Adama Sow, a sentence of incarceration is unnecessary.

## VI.

## CONCLUSION

Given Ms. Sow's serious history of trauma, desperate need for rehabilitative services, vulnerable status, lack of criminal history, and continuing contributions to her family, we respectfully submit that a sentence of time served is sufficient, and not greater than necessary, to achieve the sentencing goals set out in Section 3553(a).

Dated:       New York, New York                   Respectfully submitted,
             April 6, 2025

                                                   */s/ Justine A. Harris*
                                                   Justine A. Harris
                                                   Emily A. McDaniels
                                                   Alexandra Conlon
                                                   SHER TREMONTE LLP
                                                   90 Broad Street, 23rd Floor
                                                   New York, New York 10004
                                                   Tel.: (212) 202-2600
                                                   Fax: (212) 202-4156
                                                   jharris@shertremonte.com

                                                   *Counsel for Adama Sow*