

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 11, 2025

**BY ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Adama Sow*, 23 Cr. 593 (VEC)

Dear Judge Caproni:

      The Government respectfully submits this letter in response to Adama Sow's sentencing memorandum dated April 4, 2025 (Dkt. 57 ("Defense Memorandum" or "Def. Mem.")).  For the reasons explained below and in the Government's sentencing submission dated April 4, 2025 (Dkt. 56 ("Gov't Ltr")), the evidence and testimony at the Hearing[1] established that Sow's Guidelines range is 70-87 months' imprisonment, and a sentence within that range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

      The evidence and testimony at the Hearing conclusively showed that Sow directed a massive, yearslong, multi-employee, multimillion-dollar counterfeit trafficking business based out of the Storage Facility.  At bottom, Sow's response to this mountain of proof is that the manager and assistant manager of the Storage Facility, Fernando and Thomas Velazquez, respectively, perjured themselves and "fabricated or doctored" reams of Facility records "to help build a case against Ms. Sow."  (Def. Mem. at 29).  She also disputes the Government expert's $7.49 million estimated street value of the counterfeit goods seized from her units, and the attribution to her of $4 million or more counterfeit goods based on her historical trafficking activities at the Facility.  As set forth below, each of Sow's arguments is meritless.

    I.    **The Storage Facility Witnesses Testified Credibly and Did Not Fabricate Evidence**

      Sow argues that Fernando and Thomas, who testified that they did not fabricate any records or direct others to do so, (Tr. 119:16-120:7 (Fernando's testimony); 38:14-39:9 (Thomas's testimony)), should be "discount[ed] . . . in their entirety." (Def. Mem. at 23).  But Sow utterly fails to cast doubt on Fernando's and Thomas's credibility or on the central components of their testimony, *i.e.*, that Sow supervised one or more full-time workers, and that Facility records

---

[1] This letter incorporates the defined terms set forth in the Government's April 4, 2025 letter.

reflecting her control of the Sow Units at the time of the October 2023 Seizures are authentic and reliable.

### a. The Storage Facility Witnesses Gave Uncontroverted Testimony That Sow Supervised at Least One Worker in Her Counterfeit Goods Trafficking Operation

Sow falsely asserts that Thomas lacked personal knowledge that Individual-1 was Sow's worker. (Def. Mem. 13; *see also* Def. Mem. at 25 (claiming that Thomas's "only source" for his claim that Individual-1 was Sow's employee was that Individual-1 told Thomas he worked for Sow)). In fact, Thomas testified that he *personally observed* Individual-1 working for Sow, "under her wing," on an almost daily basis for at least a year and a half,[2] and that Individual-1 communicated with Thomas in connection with Sow's instructions and requests. (Tr. 17:13-18:18). Regarding Individual-1's statement to Thomas that he was Sow's employee, Sow falsely states, without citing to the record, that "Thomas himself appear[ed] not to believe [the statement] to be reliable." (Def. Mem. at 26). To the contrary, Thomas never expressed any doubt that Individual-1 was employed just as he told Thomas he was, and as Thomas observed him to be, namely, as Sow's full-time worker. (*See* Tr. 17:13-18:18).

Sow also claims that Thomas's testimony "was heavily influenced by his brother, if not explicitly coordinated with him" (Def. Mem. at 23), but Sow fails to substantiate that claim. She merely notes the brothers' close family relationship, professional relationship, Fernando's seniority in age, and the unremarkable fact that they discussed the investigation of Sow and other counterfeit goods traffickers at the Facility. (Def. Mem. at 23). None of those facts come close to supporting an inference that Thomas's testimony was influenced by these conversations, let alone that he deliberately fabricated or altered his testimony. Thomas did not discuss his testimony with Fernando. (Tr. 80:7-11). He did not know that Fernando was hoping to be paid in connection with his work as a confidential informant. (Tr. 54:16-19). And he did not care one way or another about the outcome of the Hearing. (Tr. 39:18-20).

Nor does Sow identify a single instance in which Thomas appeared to be reciting "coordinated" testimony. In fact, Thomas's testimony regarding Individual-1 differed from Fernando's in ways that mirrored their differing roles and vantage points. For example, Thomas testified that he observed Sow employing Individual-1 beginning around 2022, which aligns with the approximate time when Thomas transitioned from sales associate to assistant manager and began routinely walking through the Facility (Tr. 17:25-18:5); on this score, Fernando testified that Sow began employing Individual-1 beginning around 2017 or 2018, when Fernando was the assistant manager and Thomas did not yet work at the Facility. (Tr. 98:6-17; 89:19-23). As another example, Thomas testified that Individual-1 told him he worked for Sow and earned $700 per week (Tr. 17:21-24); on this point, Fernando testified that Sow told him that she paid Individual-1 $1,000 per week. (Tr. 99:5-8).

---

[2] In another misstatement of the record, Sow claims that Thomas "had never seen or heard Ms. Sow interact with [Individual-1]." (Def. Mem. at 25). Thomas's testimony was that he had never overheard a conversation between Sow and Individual-1, not that he failed to observe them together. (Tr. 78:14-18).

      To explain away Fernando's similarly unequivocal identification of Individual-1 and several others as Sow's workers, Sow emphasizes Fernando's status as a "career informant," suggesting that he had a financial incentive to lie or fabricate evidence. (Def. Mem. at 21-22). Yet Sow identifies no meaningful indicia that Fernando's testimony was unreliable.

      *First*, Sow claims that "Fernando's testimony was internally inconsistent, and his demeanor on the stand did not inspire confidence in his trustworthiness." (Def. Mem. at 22). But the only example cited by Sow for Fernando's purported "willingness to make things up" is the fact that he identified a previously unidentified person, Individal-2, as one of Sow's workers. (Def. Mem. at 22). Sow cites to no evidence that Fernando's testimony regarding Individual-2 was false.[3]

      *Second*, Sow claims that Fernando testified inconsistently about whether he believed Individual-3 was Sow's sister, claiming that the purported inconsistency was representative of "refus[als] to acknowledge small easy truths." (Def. Mem. at 22). In fact, Fernando's testimony on this entirely inconsequential point appears to have been largely consistent: his impression was that, when Sow referred to Individual-3 as her "sister," she did not mean that Individual-3 and Sow were literal, familial sisters.

      *Third*, Sow claims that Fernando "offered to put a storage unit in a [different] target's name to strengthen the agents' investigation." (Def. Mem. at 14; *see also* Def. Mem. at 29). However, Fernando never testified that he or the agents contemplated falsely transferring a unit to a different account; he merely described a proposal to update a target tenant's account information to reflect the tenant's *true name*, rather than the alias that tenant had been using to rent the units. (Tr. 130:7-11).

      Sow then mounts a feeble attack on Fernando's identification of Individual-1 as Sow's worker. She raises powerful evidence of Individual-1's working relationship with Sow—his appearance in the October 16, 2023 undercover buy video accepting cash from a counterfeit goods customer alongside Sow, outside one of her units—and recasts it as supposedly exculpatory, on the questionable premise that an employee would not receive money on behalf of his employer without "interact[ing]" with her. (Def. Mem. at 24-25). Sow's own unfounded inferences are not enough to establish any falsehood or mistake as to Fernando's understanding of the two individuals' working relationship. Next, Sow raises Individual-1's appearance in a photograph in the loading dock of the Facility, in proximity to another individual's shipment. (Def. Mem. at 25). On cross-examination, Fernando emphatically and repeatedly rejected Sow's suggestion that this photograph reflected a connection of any kind between Individual-1 and that shipment. (Tr. 195:22-196:14 (explaining, among other things, that Individual-1 was "just standing there looking at the boxes, and that if the boxes had been for him, "he would have been putting them on a cart")). As with Sow's interpretation of the undercover buy video, Sow's interpretation of the photograph borders on the absurd.

---

[3] Indeed, Fernando was asked about Individual-2 for the first time at the Hearing when the Court noticed Individual-2 in the October 16, 2023 undercover buy video. (Tr. 101:17-23).

Finally, Sow calls Fernando's testimony that Individual-3 rented the Sixteenth Unit on behalf of Sow "pure fabrication," based largely on differences between how Sow and Individual-3 rented units. (Def. Mem. at 26-27). Sow does not explain why Fernando, in his purported "misguided effort . . . to please the agents" (Def. Mem. at 27), would have invented a connection between Sow and one of the Facility's smallest-scale traffickers—a relationship that has no effect on Sow's Guidelines calculation.[4] Nor did Fernando's testimony about the relationship between Sow and Individual-3 contradict any of his prior statements to the Government. The relationship between Sow and Individual-3 came to light, not from some last-ditch effort by Fernando to falsely attribute an additional unit and worker to Sow, but as a result of the Government's efforts to ensure that it made a full and accurate accounting of Sow's storage units and workers in preparation for the Hearing.

### b. The Storage Facility Records Linking Sow to Her Units Are Authentic and Reliable

As Sow acknowledges, Facility records reflect that each of the 15 Sow Units was rented in her name at the time of the October 2023 Seizures, and that the Sixteenth Unit was rented in her name until shortly before the October 2023 Seizures. (Def. Mem. at 14 ("[T]he billing records and account summaries from storEDGE purport to associate Ms. Sow with sixteen storage units[.]")). However, she suggests that these voluminous records may have been "changed manually to reflect different names or contact information." (Def. Mem. at 14). Sow does not explain what Fernando or Thomas stood to gain by falsifying evidence against her when they pulled documents *prior to* the October 2023 Seizures, at a time when they did not know which traffickers, if any, the Government would charge, much less which *Guidelines provisions* the Government would seek to apply to such charged traffickers. In other words, whatever incentives might have existed to assist the Government's investigation, neither Fernando nor Thomas had any incentive to falsely apportion units between the various individuals who were using the Facility to traffic counterfeit goods. And as was elicited at trial, there were many units searched that they did *not* attribute to Sow, a powerful counterpoint that Sow ignores entirely.

Several pages of the Defense Memorandum are devoted to identifying purported issues with the Facility documentation introduced by the Government, apparently to bolster the suggestion that Thomas and/or Fernando fabricated evidence. (Def. Mem. at 28-31). These attempts at misdirection should be swiftly rejected.

*First*, Sow largely ignores the documentary evidence that most obviously links her to the 15 Sow Units: the Yardi and storEDGE account summaries, or "ledgers," contained in the 200-series of the Government's exhibits.[5] Those summaries bear Sow's name and contain histories for

---

[4] The Government is not seeking a 3- or 4- level Guidelines enhancement against Sow for more extensive leadership, and the Sixteenth Unit accounts for just $175,000 of the approximately $7.49 million in seized goods. (*See* Gov't Ltr at 7).

[5] Sow identifies one purported inconsistency in the account activity summaries: that one of the summaries lists a different tenant name ("Thomas Cross") for Unit 61368 than what appears in the lease paperwork ("Yanick Sow") for that unit in February 2021 (long before Sow began renting that unit in July 2023). (Def. Mem. at 29-30). That is no mystery: Yanick Sow, whom Fernando understood to be Sow's brother-in-law, used the alias "Thomas Cross." (Tr. 127:23-128:3). In

each of Sow's units, sometimes extending back years (and in most cases, long before those units came under law enforcement scrutiny), reflecting different start dates for the various units and countless unique, unit-specific entries. (*See* Gov't Ltr at 6-7; GX-201 through 212; GX-251 through 266). The notion that those summaries—including the Yardi summaries, which were printed and provided in June 2023, months before the October 2023 Seizures—were falsified, is implausible, if not frivolous.

*Second*, Sow argues that there is no "metadata" for any of Sow's unsigned contracts. (Def. Mem. at 29). Not so. The date on which each of her contracts was registered in the storEDGE system is available in the storEDGE documents logs at Government Exhibits 501 (June 6, 2023) and 502 (June 6, 2023 (continued) through October 27, 2023). Those logs reflect the existence of at least one contract for each of the Sow Units.[6]

*Third*, Sow points out that, for three units, there are also earlier-in-time contracts, and earlier-in-time handwritten notes from Fernando, associating three of Sow's units with other tenants. (Def. Mem. at 29-30). As the account activity summaries and Facility records also make clear, however, Sow began renting each of those three units during the summer of 2023, *after* the contracts and handwritten notes identified by Sow. (*See* Gov't Ltr at 7 n.7). In other words, the contracts, Fernando's handwritten notes, and the storEDGE account activity summaries are consistent with each other as to when, during the summer of 2023, Sow added each of her final three units.

*Fourth*, Sow argues that the "PTI elevator records only further confuse the issue" of which units were under Sow's control. (Def. Mem. at 30). Again, she is incorrect. The contemporaneous elevator records pulled in June 2023 (GX-401 through GX-414) reflect Sow's control of each of the units attributed to her at that time.[7] The suggestion that the hundreds of "user-generated" entries that appear in those records are attributable to falsification efforts by Facility personnel (Def. Mem. at 30) who did not even use the PTI elevator records to link tenants to storage units (*see* Gov't Ltr at 6 n.5) is nonsensical. The elevator records now available to the Facility (DX-EEE) and to PTI (DX-FFF), which are substantially similar to each other, no longer contain any usable data to speak of. For example, even for the units that Sow concedes are attributable to her, Units 61432 and 61441, the currently available elevator records are completely blank. (DX-EEE at 95, 100; DX-FFF at 137, 163; *see also* Tr. 37:3-7 (Thomas's testimony that he was able to pull PTI records while Sow was still a Facility tenant, but that he encountered difficulties pulling those same records "after [Sow] had been vacated out of [the] system")).

---

any event, that lease predates the relevant time period and, at most, stands for the unremarkable proposition that someone rented a storage unit before Sow.

[6] This includes contracts for each of the storage units rented by Sow as of June 2023, not merely four units, as Sow claims. (Def. Mem. at 29).

[7] As discussed above, Sow subsequently added three additional units during the summer of 2023, which are not reflected in the June 2023 elevator records. (*Cf., e.g.*, GX-409 (June 2023 elevator log for Unit 61438, which was not rented by Sow until August 2023, reflecting name of prior tenant)).

In sum, none of Sow's attacks on the Government's attribution proof have merit.

## II. The Street Values Provided by Michael Rieger Are Reliable

Government expert Michael Rieger's opinion regarding the approximate street values of each category of Sow's counterfeit goods, which is based on his extensive experience with undercover purchases of Canal Street-quality counterfeit goods, is reliable and should be adopted by the Court. (*See* Gov't Ltr at 7-10).

By contrast, defense expert Graham Wetzbarger's opinion regarding the prices of Sow's counterfeit goods is unreliable. (*See* Gov't Ltr at 8-10). The Defense Memorandum's recitation of Wetzbarger's professional qualifications sidesteps his lack of any experience with the market for Canal Street-quality counterfeit goods—the precise market that is relevant to the Court's calculation of the infringement amount. (Def. Mem. at 18). Accordingly, Wetzbarger's speculative estimates as to the street values of certain counterfeit goods do not call Rieger's estimates into question.

Sow also argues that the fact that she sold a counterfeit backpack to Fernando for $30 indicates that Rieger's estimates are exaggerated. But Sow never told Fernando what she believed that backpack would sell for on the street. Nor is there any basis for determining the street value of that backpack by adding the $20 profit margin that *Fernando* said he would apply to the $30 price for which Sow sold him the bag. Sow and Fernando had a longstanding and friendly relationship (Tr. 177:18-19), and she was willing to give him the bag free of charge, indicating that the $30 price for which she sold him the backpack was an arbitrary and extremely favorable price with no bearing on its true street value. Thus, the undervalued price secured by Fernando on a single occasion does nothing to undermine the accuracy of Rieger's estimates. *See, e.g.*, *United States v. Shi Chang Huang*, 491 F. App'x 382, 385 (4th Cir. 2012) (affirming district court's rejection of an "alternative [infringement amount] valuation based on only a few undercover sales [that] would not necessarily have produced a more accurate estimate" than the estimate provided by a law enforcement agent).

## III. Sow Historically Trafficked in at Least $4 Million in Additional Counterfeit Goods

Sow argues that the Court cannot reasonably estimate an infringement amount for Sow's historical counterfeit trafficking activities. She is wrong. There is ample evidence that Sow historically trafficked at least $4 million—and likely far more—in counterfeit goods. (*See* Gov't Ltr at 10-12). There is no need to "project" or "extrapolate" such figures; they are reflected by the funds that moved through Sow's own business bank accounts.[8] (*See* Gov't Ltr at 11-12).

---

[8] Other than a comparatively trivial sum of $22,800 in rental income, Sow does not identify any legitimate source for the millions of dollars that moved through her business bank accounts. She claims to have run a legitimate "T-shirt business" out of the Facility (Def. Mem. at 28-29), but that claim is not supported by the PSR or by any of the evidence introduced at the Hearing. In any event, Sow has not claimed what income she derived from this purported business.

Sow also takes issue with the alternative calculation methodologies advanced by the Government. Her arguments against those methodologies are unpersuasive. She observes that Fernando and Thomas provided different estimates of the volume of counterfeit goods received by Sow (Def. Mem. at 38), but that argument is mooted by the Government's use, in its first alternative calculation, of Thomas's more conservative estimate that Sow typically received deliveries of 50 to 75 boxes per day.[9] (*See* Gov't Ltr at 10-11 (estimating weekly turnover of $180,000)). She also claims, incorrectly, that "there are no clear records linking Ms. Sow to particular storage units for much of the pre-2023 time period." (Def. Mem. at 39). However, Sow's account summaries provide, among other information, the precise date on which each storage unit was placed in her name, going back as far as 2019. (*See* Gov't Ltr at 10 & 10 n.13).

### IV. Conclusion

For the reasons explained above, as well as those in the Government's April 4, 2025 letter, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 70 to 87 months' imprisonment.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By: _____
Sarah Mortazavi / Henry L. Ross
Assistant United States Attorneys
Tel: (212) 637-2520 / 2442

cc:   Justine Harris, Esq. (by ECF)
      Emily McDaniels, Esq. (by ECF)

---

[9] Sow also misconstrues Fernando's testimony regarding hardship discounts to suggest that they indicated that Sow's business was slow. (Def. Mem. at 39). To the contrary, Fernando testified that the Facility entered "hardship" discounts, as well as "senior citizen" and other discounts, into the Facility's system so that Sow could receive discounts. (Tr. 176:5-6 ("Q. So business was not booming, correct? A. That's what we put to be able to give the discount."); 159:9-16 (discussing Fernando's authorization of "senior citizen" and "flea market" discounts)).