# SHER TREMONTE LLP

April 11, 2025

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re: *United States v. Adama Sow*, 23 Cr. 593 (VEC)

Dear Judge Caproni:

      We represent Adama Sow and write in response to the government's sentencing submission (ECF No. 56) and to supplement Ms. Sow's sentencing submission (ECF No. 57).

      Though Ms. Sow admitted to the underlying offense by pleading guilty, she has vigorously contested the applicability of the government's proposed sentencing enhancements. Despite the two-day *Fatico* hearing, where the government had every opportunity to present evidence to this Court that would support the application of the sentencing enhancements it asks this Court to apply, the government has failed to meet its burden. Instead, the government's presentation at the *Fatico* hearing and its sentencing memorandum make clear that apart from Ms. Sow's admission through her plea, the government's case depends on unreliable testimony and documents, and many unproven assumptions.

      The government assumes that anyone who interacted with Ms. Sow at the storage facility, but did not work for the storage facility, was her employee; that every box shipped to the storage facility for Ms. Sow (under various unsubstantiated aliases—not her real name) contained counterfeit goods; that every storage unit that was ever assigned to Ms. Sow in Gotham's internal systems continued to be used by her indefinitely; that Ms. Sow's counterfeit business did not slow down or stop in the pandemic, like the vast majority of retail businesses; and that every transaction in her business bank accounts was connected to her counterfeit business. The government's assumptions are unsupported, and in some cases, contradicted by the evidence. And in any event, the government's assumptions are no substitute for the "solid" reliable "evidence of relevant conduct" that this Court has a "special obligation" to demand when the Sentencing Guidelines "allow for punishment of relevant conduct as though it were convicted conduct." *United States v. Archer,* 671 F.3d 149, 165 (2d Cir. 2011).

I. **THE GOVERNMENT FAILED TO ESTABLISH THAT THE TWO-LEVEL LEADERSHIP ENHANCEMENT APPLIES TO MS. SOW.**

The government points exclusively to testimony from Fernando and Thomas Velazquez to support its claim that Ms. Sow "employed full-time workers to assist her with her criminal enterprise." Gov't Sentencing Mem. at 4,[1] ECF No. 56. The government does not (nor could it) offer any evidence to corroborate the exaggerated testimony of the Velazquez brothers.

Ms. Sow was under investigation by multiple law enforcement agencies for years.[2] But the government offered no surveillance video footage of Ms. Sow's supposed employees; no corroborating testimony or documentation from law enforcement agents conducting surveillance of the storage facility; no identifying information for Ms. Sow's supposed employees; no proof that Ms. Sow ever paid the supposed employees (or anyone else) in the same amount on a regular basis (despite conducting a thorough examination of Ms. Sow's bank records); and no testimony or other evidence from employees of the storage facility who were not acting as paid confidential informants.

As we set out in Ms. Sow's opening submission, the Velazquez brothers testified incompletely, inconsistently and incredibly concerning Ms. Sow's alleged employees. *See* Def. Sentencing Mem. at 30-34, ECF No. 57. Though both brothers claimed that Ms. Sow employed an Albanian, Hr'g Tr. Day 1, at 17, or Lebanese man, *id.* at 192, Thomas testified that Ms. Sow had employed only the Albanian or Lebanese man whereas Fernando testified that she employed at least four people. *Compare id.* at 19-20 (Q: "Apart from the person you described as her worker, who else did you see Sow working with, if anyone? A: Typically no one else.") *with id.* at 97, 101-03, 155 (claiming Ms. Sow also employed a Black man, a tall, dark-skinned man, and a woman). Despite their claims that they regularly observed and interacted with the Albanian or Lebanese man, with such apparent familiarity that the man volunteered information about his supposed payment arrangement with Ms. Sow to them, neither brother could identify the man by name. *Id.* at 17-18, 78, 192-93. And the hearsay testimony the Velazquez brothers gave concerning the Albanian or Lebanese man's payment arrangement with Ms. Sow was inconsistent—Fernando testified that the man was paid $700 week in cash, *id.* at 17, whereas Fernando testified that he was paid $1,000 per week, *id.* at 193. Indeed Thomas, to his credit, admitted that he was unsure whether the Albanian or Lebanese man actually worked for Ms. Sow, as opposed to as an agent for a supplier, and that he did not actually know the financial arrangement Ms. Sow had, if any, with the man. *Id.* at 79-80.

---

[1] Page numbers refer to the ECF-stamped page number shown on the top of the page.
[2] *See* Press Release, United States Attorney's Office Southern District of New York (Nov. 15, 2023), https://www.justice.gov/usao-sdny/pr/largest-ever-counterfeit-goods-seizures-result-trafficking-charges-against-two (crediting Homeland Security Investigations ("HSI"), the New York City Police Department ("NYPD"), United States Customs and Border Protection ("CBP") and the United States Attorney's Office for the Southern District of New York with the investigation that led to Ms. Sow's arrest).

Further, despite the brothers' years-long provision effort to law enforcement as they investigated Ms. Sow, neither brother alleged in any conversation with the government that Ms. Sow had an employee until long after the case had been thoroughly investigated, charged, and resolved with a guilty plea. For that reason, during the plea colloquy, the Court had the following exchange with the government concerning this sentencing enhancement:

> The Court: I actually have a question on the guidelines calculation, Mr. Ross. You have provided neither an aggravating role sentence nor a mitigating role offense in your calculation. Based on your investigation, neither is appropriate?
>
> Mr. Ross: That's our position at this point, your Honor, yes.

*See* Tr. May 2, 2024 at 14, ECF No. 19. Indeed, as Thomas admitted on cross-examination, the first time he mentioned Ms. Sow's supposed employee to the government was on January 30, 2025, when he was preparing to testify for the *Fatico* hearing. *See* Hr'g Tr. Day 1, at 77. Even more incredible, Fernando identified a man visible in a video of an undercover purchase that he had made years before and had discussed with the government numerous times as one of Ms. Sow's workers for the *first time* during the *Fatico* hearing. *Id.* at 155. Fernando's unsupported claims concerning the other two alleged workers that he only recently identified—Ms. Sokhna Mai Dieng and an unnamed tall, dark-skinned man—are equally implausible. *See* Def. Sentencing Mem. at 29, 32-34. Not only did Fernando omit the allegations concerning Ms. Dieng and the other supposed workers until just before the hearing, to the extent Fernando had mentioned them to law enforcement at all, he had described them as independent operators. *Id.*

Moreover, apart from the brothers' inconsistent and incredible claims regarding the Albanian or Lebanese man, the government did not even offer sufficient evidence that, if true, would establish that Ms. Sow's interactions with the supposed workers identified by Fernando satisfies the elements of the aggravating role enhancement.

The enhancement requires that the defendant led, managed or supervised a "participant" in the alleged criminal activity. *See* U.S.S.G. § 3B1.1. A "participant" is a "person who is criminally reasonable for the commission of the offense." U.S.S.G. § 3B1.1 Commentary, n.1; *see United States v. Ware*, 577 F.3d 442, 453 (2d Cir. 2009) (finding district court erred by applying leadership role enhancement based, in part, on defendant's supervision of person "who contributed unknowingly" to defendant's scheme and could not "be considered 'criminally responsible'" for defendant's conduct). Fernando's testimony about the knowledge and role of the supposed other workers was sparse. For example, he alleged that the unnamed, tall, dark-skinned man moved boxes for Ms. Sow for approximately one year from 2017 to 2018.[3] *See* Hr'g Tr. Day 1, at 97-99. Even if the Court credits that testimony (and it should not), Fernando's testimony does not establish that unnamed man knew that the boxes he allegedly moved contained counterfeit items that she was unlawfully selling. Finally, even if Ms. Dieng, the Albanian or Lebanese man, and

---

[3] The Gotham records introduced by the government at the *Fatico* hearing do not show that Ms. Sow rented any storage units prior to late 2019. *See* Gov't Ex. 203.

Hon. Valerie E. Caproni
April 11, 2025
Page 4 of 12

the Black man who can be seen on the undercover purchase video Fernando made were working with, rather than independent of, Ms. Sow, there is no evidence, apart from Fernando's testimony, that Ms. Sow "exercised some control over" them or that she was "responsible for organizing [them] for the purpose of carrying out the crime." *United States v. Greenfield,* 44 F.3d 1141, 1146 (2d Cir. 1995); *see* Def. Sentencing Mem. at 24-27.

The Court's decision about the applicability of leadership enhancement is of paramount importance for the calculation of Ms. Sow's guidelines range. If the Court concludes that Ms. Sow played an aggravating role by acting as an organizer, leader, manager and/or supervisor of anyone, a two-level increase applies to her guidelines range *and* Ms. Sow becomes ineligible for a two-level reduction for being a zero-point offender. *See* U.S.S.G. §§ 3B1.1(c), 4C1.1(a)(10). The Velazquez brothers' testimony alone cannot bear the great weight of that decision.

### II. THE GOVERNMENT FAILED TO ESTABLISH THAT THE INFRINGEMENT AMOUNT ATTRIBUTABLE TO MS. SOW TOTALED AT LEAST 9.5 MILLION.

The government asks the Court to apply a 20-level increase to Ms. Sow's guidelines calculation based on its contention that the value of the infringing goods was more than $9.5M and less than $25M. *See* Gov't Sentencing Mem. at 2; U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1(b)(1)(K). The government's estimate of the value of the infringing goods requires the Court to accept three incorrect claims: (1) that Sow controlled the 16 units from which the government seized goods in October 2023; (2) that the value of the seized goods should be calculated based on the midpoint of the value range proposed by the government's expert; and, (3) that Ms. Sow's historical transactions in counterfeit goods can be reliably estimated and amount to $4M. Because each of the government's three foundational claims is unsupported by reliable evidence, the government has not met its burden of establishing by a preponderance of the evidence that the infringement amount exceeds $9.5M and a 20-level increase in Ms. Sow's guidelines is inappropriate.

#### A. The Government Did Not Prove by a Preponderance of the Evidence that Ms. Sow Should Be Held Responsible for the Goods Seized from All 16 Units.

The government's claim that Ms. Sow controlled 16[4] of the 57 units that law enforcement searched and seized in October 2023 is based exclusively on testimony and records from the Velasquez brothers. *See* Govt. Sentencing Mem. at 5-7. The government did not recover any items that connected Ms. Sow personally to the 16 units (i.e. mail addressed to her or other identifying records or personal items), and there is no evidence that the property recovered from the 16 units differed in any way from the items recovered from the other 41 units that the government searched and seized. For the reasons discussed in Ms. Sow's opening brief and *supra*, at 2-4, the Velazquez brothers' testimony is generally incredible, especially given the lack of any corroborating evidence.

---

[4] The government seeks to attribute to Ms. Sow units 61132, 61368, 61370, 61402, 61430, 61432, 61433, 61434, 61437, 61438, 61440/61441, 61442, 61443, 61459, 61467, and 61471/61472. Gov't Ex. 1012.

4

While the government relies principally on the Gotham records to bolster the Velazquez brothers' testimony, it in fact did not produce a single, credible document that corroborates that Ms. Sow controlled (or even accessed) the 16 units the government seeks to attribute to her. *See* Def. Sentencing Mem. at 13-16, 35-38. Though the Velazquez brothers had various explanations for the missing, incomplete, and apparently edited documentation the government did introduce, the documents for the 16 units stand in stark contrast to the lone document the government produced for a unit Ms. Sow readily admits she used for her legitimate t-shirt business. The lease agreement for unit 61288, which Ms. Sow used for her t-shirt business, has the hallmarks of trustworthiness: it is in her true name; her identifying information appears in the correct places on each page (above the proper lines); each page that requires a signature or initials is signed and initialed; each page that requires a date is dated, and the dated signature pages are consistent with the dates on the pages confirming relevant payments. *See* Gov't Ex. 102A. In contrast, the documents linking Ms. Sow to the 16 units lack any indicia of reliability. The lease agreements for those units are unsigned, undated, lack initials, contain information in the wrong places (*i.e.* not in the space that the form calls for) and are missing information that is called for. *See e.g.*, Gov't Ex. 104A. For reasons that remain unknown, the government offered no metadata in connection with these materials, despite repeated requests by the defense.

The explanations for the shoddy documentation proffered by the Velazquez brothers do not make the documents more credible. Some of the documents the government submitted were apparently generated by mistake at Thomas's direction by an unidentified colleague.[5] Hr'g Tr. Day 1, at 22. The billing records and account summaries for the 16 units, while less facially defective, were readily susceptible to revisions and manipulation by Fernando, Thomas and their colleagues, and Fernando admitted that he had, on at least one occasion, offered to edit those documents in aid of a law enforcement investigation at Gotham. *Id.* at 130. The Velazquez brothers were unable to explain how Gotham's elevator security system (PTI) records a user's

---

[5] Thomas's testimony concerning the mistakenly generated storEDGE documents is particularly concerning. Thomas testified that although the storEDGE leases appeared to have been generated by him, they were not. *See* Hr'g Tr. Day 1, at 31. As he explained "if I'm logged into my computer, and one of my sales associates could jump on my computer, and whatever they do with my profile, it generates as me being the sole creator of that document or sole creator of that action that was taken on that account." *Id.* In this instance, Thomas testified that an unnamed sales associate must have "mistakenly created" new lease agreements for Ms. Sow from storEDGE "instead of pulling the original lease[s]." *Id.* at 31-32. But this begs a question: why would the sales associates start creating leases in October 2023 if such lease agreements already existed in storEDGE, a "user friendly" system where the lease documents are automatically electronically generated. *Id.* at 30. That this "error" was made in connection with a request for documentation from law enforcement for a criminal case casts serious doubt on the reliability and accuracy of the other documents that Fernando and Thomas generated and provided to the government in this investigation.

5

Hon. Valerie E. Caproni
April 11, 2025
Page 6 of 12

access when the user is associated with multiple units and the records appear on their face to contain unexplained edits made by unidentified persons. *See id.* at 22-23.[6]

Ms. Sow's guilty plea does not make the number of units for which she should be held responsible a foregone conclusion. That is still something the government must prove, but it has failed to do so here. Ms. Sow has admitted that she had access to units 61432 and 61441 for counterfeit goods, as seen on the undercover buy videos. *See* Gov't Ex. 801. However, there is no proof that these units were exclusively within her control. Indeed, given the number of people accessing the unit to conduct transactions, it appears to be a shared "showroom." But there is insufficient proof linking her to the 14 additional units.

To aid the Court in understanding what was seized from the various units, the defense has prepared a demonstrative table summarizing the items seized (and their corresponding "low" and "average" values) from each of the sixteen units. This demonstrative was created using the data in the government's inventory spreadsheet (Gov't Ex. 1012), which presents the same information by brand rather than by unit. *See* Ex. A.

### B. The Government Did Not Prove by a Preponderance of the Evidence that the Retail Value of the Counterfeit Goods Falls in the Middle of the Price Range Calculated by the Government's Expert

*First*, and most importantly, the government's estimate of the street value of the seized goods turns on a key misinterpretation or mischaracterization of the value range that Michael Rieger, the government's expert, prepared for this case (as reflected in Gov't Ex. 1012).

Even crediting Rieger's testimony that all of the goods seized in this case are mid-quality counterfeits, which the Court should not do, as discussed below, Rieger testified that the low, mid, and high value ranges that he calculated as the likely retail value of the seized counterfeits accounts for the entire range of settings in which the counterfeits could be sold. He specified that the range he calculated took into account that the same mid-quality counterfeit could be sold "anywhere from street peddlers to . . . a store, or, you know, a salon, a brick-and-mortar location." Hr'g Tr. Day 2, at 271. Rieger agreed that the same mid-quality counterfeit item would likely sell at a different price in a store than by a street peddler on the street. *Id.* at 268; *id.* at 242 (responding to question about the factors that influence how much a counterfeit item sells for, Rieger testified "it could be the condition of the item . . . where it's being sold, is it being sold by a street peddler in the street or is it being sold in a hair salon or in a boutique or different geographic location").

---

[6] Thomas suggested that the apparent user edits on the face of the PTI documents do not reflect edits made by any person but instead are the result of the "systems automatically re-updat[ing] themselves." *Id.* at 59. He agreed that Gotham employees "can access elevator records" and are "on the actual system," but suggested that Gotham employees had not "edit[ed] anything inside of PTI." *Id.* Thomas's explanation simply makes no sense, is contradicted by the face of the PTI records and ignores that records were apparently easily altered by Gotham employees in other systems, like storEDGE.

Hon. Valerie E. Caproni
April 11, 2025
Page 7 of 12

>An exchange between the Court, the government, and Rieger crystalizes this issue.
>
>Q. For a moment, putting aside the condition of the goods, so just assuming ordinary condition of the goods, if a given item on this spreadsheet were to sell on the street numerous times over the course of the day, based on your experience, where would you expect the price to land?
>
>A. It would land right about that average number.
>
>Q. And is that true for each of the categories of goods you've looked at?
>
>A. Yes.

*Id.* at 250. The Court asked whether that is "in part because some people are better negotiators with peddlers than others," assuming, based on Rieger's earlier colloquy with the government, that Rieger's valuation range for the seized items was limited to the low, mid and high point at which those items would sell in the market relevant to this case—Canal Street. But Rieger's response to the Court makes clear that his valuation range accounts for the low, mid and high point at which the seized items would sell in *any* market. In response to the Court's question, Rieger said:

>It's part because of that and it's also part of where you buy it. Buying a counterfeit Louis Vuitton handbag, for instance, is cheaper from a street peddler than it is in a hair salon that sells them on the side. And it could also be where you sell them — is it in the suburbs where these things are hard to come by or is it on Canal Street where they're every 15 feet. So they sell for different prices depending on where they're being sold.

*Id.* at 250-51. Rieger repeatedly testified that the value range he estimated for the seized goods reflects the likely low, middle and high price at which those goods could sell in *any* market.

Yet the government presented scant evidence about where, how, to whom, and the price at which the seized items in this case were actually sold. But the limited evidence the government did present on this score through Fernando's testimony suggested the counterfeit items were sold primarily on Canal Street. *See* Hr'g Tr. Day 1, at 127 (Q: "So a fair bit of the business and these goods ended up on Canal Street, right?" A: "Yes."); *id.* at 175 (Q: "And even though most of her customers, as you testified, sell on Canal Street, nonetheless, business was booming, correct?" A: "Yes."). Because Canal Street, the relevant market in this case, is at the bottom end of the market for counterfeits that Rieger took into consideration when estimating the value ranges, the Court should use his estimate of the low point at which the seized items would sell, which best represents the average price at which the seized items in this case would sell in the market where they were actually sold.

*Second*, regardless of the government and Court's view of Wetzbarger and Rieger's relative qualifications,[7] Wetzbarger's testimony concerning the poor quality of many of the bags he inspected counsels in favor of using Rieger's low-point rather than mid-point price estimates. The representative sample of items that Wetzbarger reviewed suggests that many of the seized items had visible defects that depressed their value, entirely independent of whether they were good quality counterfeits. Wetzbarger testified that a number of the items he examined literally broke in his hands as he examined them. *See e.g.*, Hr'g Tr. Day 2, at 335; Def. Sentencing Mem., Ex. B-5. In one instance, he testified that he tried to open the interior zipper of a bag and it malfunctioned, coming off in his hand. *See* Hr'g Tr. Day 2, at 331; Def. Ex. C-7. Even if the Court adopts the government's view that some of Wetzbarger's observations concerning the defects in the counterfeits would not have been readily observed by an unsophisticated buyer, common sense dictates that broken bag straps and broken zippers depress the value of a counterfeit handbag, as would [bad fakes] that in no way mimic the original. *See* Govt Sentencing Mem. at 9; Hr'g Tr. Day 2, at 265-66.

### C. The Government Provides No Reliable Basis for the Court to Extrapolate the Retail Value of Ms. Sow's Historical Conduct

The government's estimate of the value of Ms. Sow's historical trafficking in counterfeit goods is unsupported by the facts and untethered to the law. Apart from testimony and records from the Velazquez brothers, which is not reliable evidence for the reasons discussed *supra*, at 2-6, the government points to only two facts to support its historical trafficking estimate of $4M. First, the government notes that at the time of the October 2023 seizure from Gotham the "emptiest of the 16 units at issue" contained approximately 2,600 items, and, second, that certain of Ms. Sow's bank records from May 2021 to September 2022 show large amounts of money moving through her bank accounts. Both of the government's inputs rely on unproven assumptions, and neither supports the government's extrapolated output.

With respect to the extent of Ms. Sow's inventory, the government assumes, without a basis, that the amount of inventory in any unit, even the least full unit, at the moment of the government's October 2023 seizure is representative of Ms. Sow's *weekly* inventory in every unit from January 2020 to September 2022. For the avoidance of doubt, Ms. Sow denies that she had

---

[7] Like Rieger, Wetzbarger's knowledge of the price at which a counterfeit luxury item is likely to sell is based on his observations from his personal experience. Neither Rieger nor Wetzbarger had any alternative source of data or information. And while understanding the counterfeit market generally was relevant to both experts' testimony, equally important was each experts' knowledge and experience with examining and assessing the quality of counterfeit goods. Both experts agreed that how closely a counterfeit mimics its branded counterpart is an important factor in determining the street value of the counterfeit. *See* Hr'g Tr. Day 2, at 263, 364. And as to that point, Wetzbarger was plainly qualified. Further, while Wetzbarger offered detailed testimony concerning the items he examined and explained the basis for his conclusions about the relative quality of each item, there is no evidence that Rieger studied the quality of the counterfeit items in this case, apart from determining that they were counterfeit and noting their packaging. *Id.* at 244-45; 270-71.

8

Hon. Valerie E. Caproni
April 11, 2025
Page 9 of 12

control over the sixteen units from which the government seized counterfeit goods. But, even if Ms. Sow had control over all sixteen of those units at the time of the government's seizure, there is nothing in the record to support the assumption that from January 2020 to September 2022 *in the midst of a global pandemic* Ms. Sow was "receiving (and selling) enough goods to fill her least-used unit on a weekly basis," making her "weekly turnover" "$180,000 in counterfeit goods." Gov't Sentencing Mem. at 11.[8]

Despite the government's long-term investigation of the counterfeiting business at the Gotham storage facility, which included real-time surveillance from multiple law enforcement agencies, the government did not produce or present any evidence—apart from the unreliable and uncorroborated testimony of the Velazquez brothers—regarding the volume of shipments Ms. Sow received over time. The government produced no documents or information concerning the sender of any shipments Ms. Sow supposedly received; no documents or information from the carriers, like a manifest or bill of lading, concerning the shipments; no documentation from customs concerning the arrival and admittance of international shipments directed to Ms. Sow; no testimony or documentation from any employee for a shipping company that made daily or weekly trips, as claimed by the Velazquez brothers, to deliver hundreds or thousands of packages all to Ms. Sow; and no evidence of a large volume of packages being removed from the Gotham storage facility on a weekly basis, as would be required if inventory actually turned over weekly as the Velazquez brothers claimed. Simply put, no reliable evidence supports the government's assumption that Ms. Sow historically trafficked in at least $180,000 per week in counterfeit goods.

The government's alternate basis for its proposed historical trafficking estimate—certain of Ms. Sow's bank records—fares no better. The government assumes, without basis, that all of the transactions in the Tola Rapid Inc. and Tola Serving bank accounts are tied to trafficking, but on their face, the records also appear to include legitimate transactions, like income from Ms. Sow's rental properties, and transfers between Ms. Sow's bank accounts. In addition, there is no proof that Ms. Sow had exclusive control over the Tola accounts; based on the record before this Court, it is also possible that one or more people used the Tola accounts to conduct an entirely

---

[8] It is implausible that any retail business, particularly one that depends on tourists traveling to New York City, was immune from the effects of the global pandemic. Indeed, during the COVID-19 pandemic, activity throughout New York City, such as Canal Street, significantly declined. *See e.g.*, Ceylan Yeginsu & Derek M. Norman, *'If No Tourists Come, I Have No Business': New York's Tourism Crisis*, The New York Times (Oct. 9, 2020), https://www.nytimes.com/2020/10/09/travel/nyc-tourism-travel-restrictions.html; Patrick McGeehan, *Broadway Is Dark. Liberty Island Is Empty. Will the Tourists Come Back?*, The New York Times (Jul. 24, 2020); https://www.nytimes.com/2020/07/24/nyregion/nyc-tourism-coronavirus.html; Patrick McGeehan, *Tourism, Engine for N.Y.C. Economy, May Not Fully Recover Until 2025*, The New York Times (Nov. 16, 2020); https://www.lohud.com/story/money/2021/04/29/nyc-2020-tourism-covid/4869913001/; *New York City Tourism Industry Hit Hard by Pandemic, Visitor Spending Drops by 73%*, Office of the New York State Comptroller (Apr. 28, 2021), https://www.osc.ny.gov/press/releases/2021/04/new-york-city-tourism-industry-hit-hard-pandemic-visitor-spending-drops-73.

different business. Indeed, the government has made no effort to conduct any sort of tracing analysis to identify the companies to which money is sent and received. Rather, it simply puts the records before the Court and asks the Court to assume they relate to exclusively to trafficking in counterfeit goods.

Under controlling law, this is plainly insufficient. It is the government's burden, not Ms. Sow's, and not the Court's, to identify a reliable basis upon which the Court can extrapolate Ms. Sow's historical trafficking. When the government seeks to impose punishment on the theory that a sample of a defendant's conduct is representative of her prior conduct in other instances, the government needs to establish that the sample upon which it relies is "a representative slice" of the defendant's conduct and can be fairly used for random representative sampling. *United States v. Archer*, 671 F.3d 149, 163 (2d Cir. 2011).

The Second Circuit's opinion in *Archer* is instructive. There, the defendant, an immigration lawyer, was convicted of fraud at trial based on proof that he had filed four fraudulent immigration applications. *Id.* at 153. At sentencing, the district court imposed multiple enhancements, including an enhancement based on the government's representation that the defendant made 175 fraudulent applications, though only four were presented at trial. *Id.* at 154. The Second Circuit remanded the case for resentencing because, among other reasons, the sentencing court had assumed, without a sufficient basis, that the four fraudulent applications presented at trial were representative of the 175 applications the defendant had submitted. *Id.* at 163. The Court explained that the "four applications present at trial were not randomly selected from the population." *Id.* ("The first and most obvious flaw in the government's reasoning is that it has presented no evidence that the four applications proven false at trial were, in *Shonubi*'s relevant way, a representative slice of the 175 applications on which the government relies."). The *Archer* Court emphasized that where the government seeks an enhancement based on an unproven estimate of the defendant's prior conduct, it must provide a sound methodology or basis for that estimate:

> Thus, we have held that a court may not assume that because the defendant was convicted of dealing drugs, all the money that he has is drug money … and we have held that simply because a defendant was convicted of cashing forged checks, it was error to conclude that every check he cashed was fraudulent[.]

*Id.* at 164-65. Just as the Second Circuit held in *United States v. Shonubi (Shonbui I)*, 998 F.2d 84 (2d Cir. 1993) and *United States v. Shonubi (Shonubi II)*, 103 F.3d 1085 (2d Cir. 1997), an extrapolated estimate for a sentencing enhancement must be supported by "specific evidence" and not "only speculation." *Archer*, 671 F.3d at 162. While all sentencing enhancements must be proven to the Court's satisfaction before they can be applied, "[w]hen the Guidelines allow for punishment of relevant conduct as though it were convicted conduct, [courts] have a special obligation to ensure that the evidence of relevant conduct is solid." *Id.* at 165.

The Velazquez brothers' testimony and Ms. Sow's bank records do not constitute the "solid," "specific evidence" required to support a sentencing enhancement. The brothers' inconsistent testimony concerning Ms. Sow's historical conduct is "insufficient from which to extrapolate any particular frequency of sales, let alone weekly sales." *United States v. Burks*, 784

F. App'x 821, 825 (2d Cir. 2019) (finding district court's extrapolation of defendant's drug sales clearly erroneous where "[t]he only evidence in the record from which to infer the frequency of drug sales was the testimony of the confidential source that Burks sold cocaine on 'multiple occasions' over six months").

Even if the bank records did clearly reflect counterfeit activity, there is no basis to conclude that the records offered by the government are a "representative" sample from which the Court can extrapolate the extent of Ms. Sow's historical activity. The government alleges that Ms. Sow trafficked in $4M worth of counterfeit goods from January 2020 to September 2022, but it refers the Court only to bank records from part of that period. In particular, the government points to records from a TD Bank account in the name of Tola Rapid Inc. (x8604) from May 2021 to September 2022, Gov't Ex. 1010, and to records from a Chase bank account in the name of Tola Serving (x2316) from April 2022 to September 2022, Gov't Ex. 1004. But bank accounts associated with Ms. Sow covering the period from January 2020 through (and beyond) the October 2023 seizure paint a very different picture of Ms. Sow's finances. *See* Gov't Ex. 1003 (Capital One Bank records); Gov't Ex. 1011 (TD Bank records for business in the name of A Fashion). In both of those accounts, one of which appears to be a business account, Ms. Sow made transactions that were orders of magnitude smaller than those the government suggests are representative of her historical trafficking. There is simply no basis for the government to cherry-pick which evidence is supposedly representative of Ms. Sow's historical financial transactions. *See United States v. Nunez*, No. 18-cr-318, 2021 WL 5494588, at *6 (D. Conn. Nov. 23, 2021) (rejecting government's extrapolated estimate of additional tax loss based on a "non-random sample" of tax returns where the government failed to present "reliable evidence to support" its extrapolation).

\*\*\*

For the foregoing reasons, and the reasons stated in Ms. Sow's opening sentencing memorandum, we respectfully submit that the government has failed to prove that any sentencing enhancement can be properly applied to Ms. Sow, and that a sentence of time-served is sufficient, and not greater than necessary, under Section 3553(a).

                                            Respectfully submitted,

                                            <u>/s/ Justine A. Harris</u>

                                            Justine A. Harris
                                            Emily A. McDaniels
                                            Alexandra Conlon
                                            SHER TREMONTE LLP

                                            *Attorneys for Adama Sow*

cc:      All counsel (by ECF)